Robert D. COHEN, Plaintiff,

v.

Edmund A. STANLEY, Jr., Victor Simonte, Jr., Franz Von Ziegesar and Carl R. Pite, Individually and in their capacity as Trustees of the Bowne Profit-Sharing Trust, Bowne Profit-Sharing Trust and Bowne Health Benefit Plan and Trust, Defendants.

No. 82 Civ. 210 (DNE).

United States District Court,
S.D. New York.

June 20, 1983.

Hertzog, Calamari & Gleason, New York City, for plaintiff; Loretta Preska, New York City, of counsel.

Simpson Thacher & Bartlett, New York City, for defendants; John W. Ohlweiler, New York City, of counsel.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDELSTEIN, District Judge:

### INTRODUCTION

This is an action under the Employee Retirement Income Security Act of 1974, as

amended, 29 U.S.C. §§ 1001 *et seq.* (1976 & Supp. IV 1980) ("ERISA") to compel the trustees of a profit-sharing plan to accelerate payment of the benefits held in the plaintiff's, a former employee's, account such that he would receive a lump sum prior to the date set forth in the plan. The trustees refused the employee's request on the ground that the plaintiff terminated his employment to work for a competitor. This action raises questions as to whether a change of employment by a plan participant is a permissible subject of trustee discretion in deciding whether to accelerate pension payments, and whether in the circumstances of this case the trustees exercised their discretion arbitrarily and capriciously.

## FACTUAL BACKGROUND

Plaintiff Robert Cohen ("Cohen") commenced his employment with Bowne of New York, Inc. ("Bowne"), a subsidiary of Bowne & Co., Inc., on January 28, 1974. Bowne engages in financial, corporate, commercial and legal printing and in providing computer text, time-sharing services. Bowne's principal place of business is New York City, and it has subsidiaries in various locations throughout the United States.

During his employment at Bowne, Cohen held the position of pricing analyst in Bowne's pricing and estimating department. In that capacity, he evaluated the cost of work performed by Bowne employees and sent invoices to customers for the work. Trial Transcript ("Tr.") 233. As a pricing analyst Cohen did not have responsibility for generating business and had only infrequent contact with customers. Pre-Trial Order, dated November 30, 1982, Stipulated Fact ("Stipulated Fact") (n).

On March 17, 1981, Cohen resigned his position at Bowne to accept employment at Pandick Press, Inc. ("Pandick"). Pandick is also a financial, corporate and commercial printer with its principal place of business in New York City and has a number of subsidiaries elsewhere in the United States. Initially, Cohen worked in the pricing department at Pandick, and in the summer of 1982, he was promoted to assistant pricing

manager. This position is considered a management position and involves responsibility as to billing decisions, corporate pricing policy and management of the pricing department. Tr. 239.

During his employment at Bowne, Cohen was a "participant" within the meaning of § 3 of ERISA, 29 U.S.C. § 1002(7), in an employee profit-sharing plan called the Bowne Profit-Sharing Plan and Trust (the "Plan"). The Plan was established in 1961 and amended and restated on October 31, 1972. The Plan is administered pursuant to an agreement known as the Bowne & Co., Incorporated Profit-Sharing Plan and Trust Agreement and is a deferred profit-sharing plan, which receives contributions from the business profits of the participating Bowne subsidiaries for the purpose of providing deferred profit-sharing benefits to their employees. Defendants Edmund A. Stanley, Jr., Victor Simonte, Jr., Franz Von Ziegesar and Carl R. Pite (the "Trustees") were trustees of the Plan at all times relevant herein.

Article 7.4 of the 1972 Plan (the "forfeiture provision") provided that if a Plan participant left the employ of a Bowne company or was discharged by Bowne and

> if he shall thereafter, within a period of twelve (12) months, enter into competition with, or become employed by any other employer in a capacity which is directly in competition with any of the Bowne companies, ... he may be given notice by registered letter to desist from so competing, or from being so employed, and if he shall not desist from doing so within thirty (30) calendar days after the receipt of such registered letter ..., he shall be deemed to have been discharged for cause, he shall cease to be a Participant and his right or privilege to any payment to the Trust ... shall thereupon wholly cease, ...

In effect, under Article 7.4, all funds previously paid or credited to a participant's account, whether vested or not, were forfeited if an employee went to work for a competitor of Bowne. From 1972 to 1977, three employees left Bowne and became

employed by competitors. The Trustees invoked the forfeiture provision and withheld all payments to these three employees.[1]

The Plan was amended and entirely restated effective June 17, 1977, and again on November 29, 1979, to comply with ERISA. In order to bring the Plan into compliance with ERISA, the forfeiture provision was eliminated. This change was the subject of considerable discussion among Bowne's employees including Cohen. Tr. 244–45. Cohen testified that the employees' understanding of the effect of the deletion of the forfeiture provision was they could leave Bowne's employ to work for a competitor and that this would not affect their ability to receive immediate distribution of their account balances. *Id.*

Under the 1977 Plan, which is presently in effect,[2] Articles 8.1(A) and (B) provide as follows:

(A) Distribution to a Participant of the nonforfeitable portion of his Account shall commence not later than the sixtieth (60th) day after the close of the Plan Year in which the later of the following events occur:

(1) the earlier of the Participant's Early Retirement Date [age 60, if 30 years of service] or Normal Retirement Date [age 65],

or

(2) the termination of the Participant's employment with all Controlled Companies.

(B) The Trustees may establish procedures to make distribution to a Terminated Participant at an earlier date than that specified above. . . .

In addition, Articles 12.5(A) and (B) provide as follows:

(A) The Trustees shall have the right and authority to construe and interpret the provisions of this agreement, and they may resolve any ambiguity, supply any omission and resolve any inconsistency in such manner as they deem fair and proper. The decisions and findings of the Trustees shall be conclusive and binding as to the matters therein embraced.

(B) Any decision or act made or done by the Trustees pursuant to any provision of the Plan shall be in their sole and absolute discretion.

A summary booklet entitled "Highlights of the Bowne Profit Sharing Plan for Employees of Participating Companies of Bowne & Co., Inc." (the "Summary") was distributed to all Plan participants, including Cohen. In addition to describing the mandatory payment provisions at Normal and Early Retirement Dates, the Summary states, *inter alia:* "The method and time of making payment shall be determined by the Trustees in their sole discretion, except for specific provisions in the event of death or disability."

On June 17, 1981 Cohen made a written request for an immediate distribution of his nonforfeitable balance. At that time, he was thirty-six years old, had completed seven years of service and thus, under Article 8.1, was entitled to receive his vested benefits at age sixty-five. Cohen requested the trustees immediately to distribute his benefits stating:

the Trustees pursuant to Article 8.1(B) of the Plan, have established and consistently applied procedures to make full distribution to participants of the value of their accounts as soon as practical after termination . . . I have immediate and pressing financial needs and I again request that the value of my account . . . be paid to me at once as was done to the numerous other individuals that have resigned from employment at Bowne.

Cohen concedes that he had read the above-mentioned Summary provision and that he

---

1. The three employees who forfeited their account balances and the amount of the balance are as follows: Mr. Osann forfeited $99,-057.22 in 1973; Mr. Whitehill forfeited $42,-628.68 in 1973; and Mr. Strauss forfeited $10,-373.02 in 1975. Tr. 46.

2. On November 29, 1978 the Plan was restated. The provisions in the 1977 Plan set forth appear in the 1978 Plan.

had not inquired about distribution of his benefits prior to his leaving Bowne's employ. Tr. 260–61, 267–68.

On June 22, 1981, Carl Pite ("Pite") notified Cohen by letter that the Trustees had denied his request (the "June 22 Letter"). The June 22 Letter stated: "After reviewing the circumstances of your termination of employment, and in view of your immediate subsequent employment with a competitor, the Trustees have concluded that it would not be appropriate at this time to exercise their discretion to commence payment of your account balance immediately, as you have requested." Cohen was also advised by the June 22 Letter that he would be entitled to receive his retirement benefits on his Normal Retirement Date, and that he could request review of the Trustees' decision. The June 22 Letter also stated that the Trustees would consider further Cohen's request for accelerated payment if he submitted a statement of his income, expenses and the nature of his financial need.

The June 22 Letter also indicated that pursuant to Article 8.1(D), Cohen's nonforfeitable account balance would be segregated from the Plan funds and would be deposited in an interest-bearing bank account. On July 2, 1981 this bank account was opened. At the time of his resignation from Bowne, Cohen had accumulated $27,-518.45 in his account. Under the terms of Article 7.1(B) of the Plan, Cohen's seven years of credited service meant that fifty percent, $13,759.23, of his account balance was vested and could not be forfeited.

On July 17, 1981 Cohen requested the Trustees to reconsider their decision to deny acceleration of benefits to him. Cohen enclosed a list of former Bowne employees who had accepted employment with competitors of Bowne and received accelerated distribution despite their employment with a competitor.

On July 23, 1981, Pite wrote to Cohen advising him that the Trustees rejected Cohen's assertions in his July 17 request stating "[t]he Trustees have not in the past approved accelerated payment of account balances to former employees who had in excess of $10,000 due and who left the employ of [Bowne] to work for a competitor." The Trustees reiterated that they would reconsider his application if he furnished documentation of financial need. Cohen never provided the documentation and indicated at a pre-trial conference in this action on February 10, 1982 that he was withdrawing any claim for acceleration based upon financial need. *See* Transcript of February 10, 1982 Pre-Trial Conference at p. 20.

From the time of the restatement of the Plan in 1977 until August 1980, seventy-nine Plan participants who left Bowne requested accelerated payment of the vested amount in their Plan account and the Trustees granted each of these requests. The amounts paid to these former employees ranged from $45.94 to $70,236.83. Nine of the former employees received payments in excess of $10,000, and at least two of these employees became employed in a financial printing firm that competes in some degree with Bowne.[3]

Prior to Cohen's resignation from Bowne, the Trustees denied only one request for accelerated distribution; that of John S. Morse ("Morse"). In July, 1980, Morse resigned from Bowne to accept employment with Pandick and the Trustees denied Morse's application for accelerated distribution of the more than $200,000 in his account.[4] Tr. 49, 252–56. Morse was

---

**3.** In July, 1977, Frank X. Lang left Bowne and subsequently went to work for Packard Press in New York. On October 24, 1977, Mr. Lang requested accelerated distribution of his vested interest in his account. On October 27, 1977, the Trustees distributed the full amount of his vested interest, $30,912.89. *See* Ex. 22. James Anderer terminated employment with Bowne in late 1977 to accept employment with a commercial printer in South Carolina, Charleston Lithographers, Inc. Mr. Anderer requested and received accelerated distribution of his vested account balance of $31,572.74 in January 1978.

**4.** At the time of his resignation, Cohen was aware that Morse's request for accelerated distribution had been denied because Morse had gone to work for a competitor. Tr. 253–54, 261.

Bowne's most successful salesman and Bowne lost over $2,000,000 of business to Pandick after Morse's departure from Bowne. It was also adduced at trial that Morse directly recruited Cohen to leave Bowne to work with him at Pandick. Tr. 263–64. Cohen testified that members of Bowne management expressed animosity toward Morse for leaving. Tr. 236, 252. In addition, Pite testified that his decision to vote to deny Cohen's request was influenced by the fact that Morse "wooed" Cohen to Pandick, Tr. 63–64, and his desire to be consistent with the denial of Morse's request, Tr. 74–76.

After Morse's departure, a number of other employees with Plan accounts in excess of $10,000 left Bowne to work with competitors and have not received accelerated distributions. Tr. 192–94, 204. Michael Don Romacho ("Romacho") moved to Pandick from Bowne, had more than $10,000 in his Plan account, and applied for and was denied accelerated distribution. Tr. 282. Romacho has an action pending against Bowne in connection with his request for accelerated distribution. Id. Robert Schvey terminated employment with Bowne in 1982 to accept employment with Packard Press in New York, and the Trustees denied his request for accelerated distribution on the ground that he had gone to work with a competitor and had more than $10,000 in his Plan account. Stipulated Fact (jj).

The defendants claim that the basis for the denial of accelerated distributions to Cohen is an unpublicized policy[5] adopted by the Trustees to prohibit accelerated distributions to participants who (a) have account balances in excess of $10,000; and (b) have voluntarily left Bowne to become employed by competitors of Bowne. Tr. 77–80, 92, 107–08. The parties stipulated that after June 17, 1977 the Trustees at no time notified Cohen or any other participant in writing of the alleged policy, nor

did they notify Cohen orally of the "policy." Stipulated Fact (z) and (aa). Further, Pite testified that the purpose of the non-competition provision of the alleged policy was to encourage Bowne employees to stay in the company's employ but that the Trustees never disclosed the existence of the "policy" to the employees. Tr. 225–26. Pite was unable to explain how the purported policy could induce employees to stay if they did not know about it. Tr. 228.

In their post-trial memorandum, defendants provide several explanations for the adoption of the $10,000 limitation in the alleged policy. First, they contend that the cost of supervising a large number of small accounts would impose an administrative burden with resulting expense to the Plan. Defendants' Memorandum of Law at p. 15 n. *. Second, they argue that it is difficult to obtain competitive interest rates for investments under $10,000 in individual bank accounts as required by Article 8.1(D) of the Plan. Id. Finally, they assert that a participant whose nonforfeitable benefits are less than $10,000 is unlikely to be deterred from leaving Bowne's employ by the withholding of immediate payment. Id.

The following evidence was adduced at trial regarding the alleged policy. There were no meetings of the Trustees at which the purported policy was adopted, nor were there any minutes of meetings held, or record of votes taken, or for that matter any other formal proceeding adopting such a policy, Tr. 87. Prior to Morse's resignation, several key corporate officers, including the presidents of Bowne in New York and Boston, had never heard of the "policy," exhibit 39, pp. 168, 181–82, exhibit 40, p. 309. There was no reference to the "policy" in the Summary, Tr. 227. There was no attempt to define what constitutes a competitor under the "policy," Tr. 178–79. There was no reference to the "policy" during the special meeting of the Trustees at which

---

5. Pite testified that the term "policy" was used by the Trustees to mean "a set of procedures that were customarily followed and generally understood as a means of evaluating whether a distribution on an accelerated basis should be made." Tr. 80.

Morse's request for accelerated distributions was denied, Exhibits 20 and 21.

The only documentary evidence of the existence of the "policy" is a draft summary of the alleged policy prepared in June or July 1980, almost immediately after Morse resigned. Exhibit 18, Tr. 108–09. The draft was prepared by Pite, revised by Bowne's actuaries, but was never formally adopted. Pite testified that the purpose of the draft was to memorialize guidelines for the Trustees to follow in evaluating requests for acceleration. Tr. 110. Pite further testified that the attempt to set forth in writing a policy for the Trustees was abandoned in favor of the stated policy that such requests were in the "sole discretion of the Trustees." Tr. 113.

Cohen claims that this alleged policy never existed and was contrived after Morse resigned to indicate Bowne's displeasure with Morse's departure and the loss of a substantial amount of business. Cohen argues that the Trustees denied accelerated distributions to him further to indicate displeasure with Morse. Cohen claims that in violation of ERISA the Trustees have acted contrary to the terms of the Plan. He also contends that they acted arbitrarily and capriciously in treating Cohen differently from the seventy-nine similarly-situated participants who received immediate distribution. Cohen claims that even if the "policy" existed, the Trustees breached their fiduciary duty under ERISA as the "policy" was never disclosed to the participants, and was not established "solely in the interest of the participants ..." under 29 U.S.C. § 1104.

Defendants contend that ERISA permits trustees to consider a participant's post-employment competitive activity in the administration of pension plans. Defendants contend that under the Plan participants are entitled to their benefits only upon reaching age sixty or sixty-five, but that the power to accelerate the distribution of such benefits is committed to the "sole and absolute discretion" of the Trustees pursuant to Article 12.5, and that the Trustees denial of Cohen's request was not arbitrary and capricious or in breach of their duty because it was not done for an irrational or improper purpose. Defendants argue that Cohen has not suffered any injury insofar as his position is no different than that of remaining employees. Defendants also claim they are not required by ERISA to disclose the discretionary policy of the Trustees regarding accelerating distribution of payments.

Cohen commenced this action[6] on January 12, 1982 to accelerate the payment of the money held in his account and obtain immediate distribution thereof.[7] The action was tried before the court without a jury.

## DISCUSSION

Under Article 8 of the Plan, distribution of nonforfeitable benefits commences after the close of the Plan year when the participant retires (at age sixty-five, or at age sixty after thirty years of service), or the participant's employment with Bowne terminates, whichever occurs later. Article 8 further provides that the Trustees may establish procedures to make distribution to participants whose employment has terminated at dates earlier than those provided above.

As previously discussed, until Morse's resignation the Trustees had established a consistent procedure to make distributions upon request to all participants of their entire nonforfeitable account balance when they left Bowne's employ. Cohen asserts that he is entitled to judgment on the theory that the Trustees' practice of granting requests for accelerated distribution is a

---

**6.** Cohen also sought an unspecified amount, estimated at less than $2,000, of medical benefits from defendant Bowne Health Benefit Plan and Trust. Cohen failed to introduce any evidence in support of this claim, and accordingly, the action is dismissed as against this defendant.

**7.** As of July 6, 1982, the balance in Cohen's account was $15,697.12 and the money is invested in an interest-bearing certificate of deposit. Stipulated Fact (r).

procedure established under Article 8 of the Plan and not subject to the Trustees' discretion under Article 12.5. He contends that under 29 U.S.C. § 1132(a)(1)(B) he has a statutory right to recover benefits wrongfully denied him for the failure of the Trustees to administer the Plan according to its terms. 29 U.S.C. § 1104(a)(1)(D). The court rejects this theory. It is clear that Article 12.5 invests broad discretionary power in the Trustees in administering the Plan. Accordingly, Article 8 must be read in conjunction with Article 12.5.

The Second Circuit has held that where a plan confers broad discretionary authority upon trustees in all matters pertaining to the coverage of a plan, "the judicial role is limited to determining whether the trustees' interpretation was made rationally and in good faith—not whether it was right." *Riley v. MEBA Pension Trust,* 570 F.2d 406, 410 (2d Cir.1977). The court defined the standard of review as whether the decisions of the trustees was "arbitrary or capricious" or "so egregious that it would have caused the Plan to violate general principles of law." *Id.* at 412. *See also Pompano v. Michael Schiavone & Sons, Inc.,* 680 F.2d 911, 915 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982); *Smith v. CMTA–IAM Pension Trust,* 654 F.2d 650, 654 (9th Cir.1981); *Paris v. Profit Sharing Plan for Employees of Howard B. Wolfe, Inc.,* 637 F.2d 357, 362 (5th Cir.), *cert. denied,* 454 U.S. 836, 102 S.Ct. 140, 70 L.Ed.2d 117 (1981).

As the evidence adduced at trial indicated, Cohen was treated differently from all seventy-nine participants who, after the 1977 amendments, left Bowne prior to attaining their Normal Retirement Dates and requested accelerated payment of their account balances under the Plan. Prior to Cohen's resignation, every similarly situated participant was paid.[8] Accordingly, the court finds that Cohen was treated differently than other employees before him.

The defendants argue, however, that in determining whether the Trustees acted arbitrarily or capriciously in singling out Cohen for dissimilar treatment, the inquiry must focus on whether such dissimilar treatment was based on an irrational or improper motive. *Riley v. MEBA Pension Trust, supra,* 570 F.2d at 412; *Weisler v. Metal Polishers Union & Metal Production & Novelty Workers Union 8A–28A,* 533 F.Supp. 209, 215 (S.D.N.Y.1982); *Fine v. Semet,* 514 F.Supp. 34, 44 (S.D.Fla.1981), *aff'd,* 699 F.2d 1091 (11th Cir.1983). The court agrees that this is the relevant inquiry.

In determining whether the Trustees' motivations were rational and proper the court finds that the appropriate standard is whether the Trustees acted solely in the interests of the Plan participants in exercising their discretion. 29 U.S.C. § 1104(a)(1)(A)(i). Defendants argue they were furthering the interests of the participants in denying Cohen's request because this action encourages employees to remain at Bowne, and encouraging employees to remain at Bowne adds to the company's profits and therefore furthers the interests of Plan participants as the profits of the company generate the Plan's income. *See* Defendants' Memorandum of Law at p. 13.

Defendants point to a line of authority for the proposition that in administering a plan trustees can consider a former employee's post-employment competitive conduct. *See Hummell v. S.E. Rykoff & Co.,* 634 F.2d 446, 450 (9th Cir.1980); *Hepple v. Roberts &*

---

**8.** Defendants contend that the other employees were not similarly situated because most of them had less than $10,000 in their accounts, or did not involve, in the view of the Trustees, individuals who left Bowne to work for *direct* competitors. *See* Defendants' Post-Trial Memorandum at pp. 15–16. The court agrees with defendants that most of the previous participants who received accelerated distribution had less than $10,000 in nonforfeitable benefits. With respect to the second aspect of defend-

ants' position, the court finds that defendants are now attempting to qualify their earlier statement of their alleged policy in their letters to Cohen by adding a requirement that distribution will not be accelerated where the employer goes to a *direct* competitor of Bowne. The defendants are bound by their earlier statement of the "policy." Thus, the court rejects defendants' attempt to distinguish those employees who went to work for competitors as opposed to direct competitors.

*Dybdahl, Inc.,* 622 F.2d 962 (8th Cir.1980); *Fremont v. McGraw-Edison Co.,* 606 F.2d 752, 756 (7th Cir.1979); *cert. denied,* 445 U.S. 951, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980); *Riley v. MEBA Pension Trust, supra; Watts v. Wikoff Color Corp. of S.C.,* 543 F.Supp. 493, 497 (N.D.Tex.1981); *Nedrow v. MacFarlane & Hays Co. Employees Profit Sharing Plan & Trust,* 476 F.Supp. 934, 938 (E.D.Mich.1979). While the court does not dispute that defendants' statement is an accurate statement of the law, the court notes, however, that these cases are not controlling herein as they involve the application of an anti-competition clause in the plan. In addition, and more importantly, none of these cases involve the central feature of this case, the departure from a uniform and consistently-applied practice.

Even assuming defendants' contention that trustees can consider post-employment activity, the court finds that as a matter of law that such consideration here was not solely in the interests of the Plan participants. The decision in *Frary v. Shorr Paper Products, Inc.,* 494 F.Supp. 565 (N.D.Ill. 1980) supports this finding. In that case, as in this case, the plaintiff was a participant in a profit-sharing plan and the plan provided that participants would receive their account balances on their normal retirement date or the date their employment terminated, whichever was later. Similarly, in *Frary,* the plan provided that the trustees had discretion to make accelerated distribution of a participant's account balance prior to his normal retirement date. Frary resigned, went to work for a competitor, and his subsequent request for accelerated distribution was denied on the ground that the defendants had a policy of rejecting such requests to employees who went to work for competitors. Additionally, and as in the instant case, every participant who had requested accelerated distribution prior to plaintiff had received it. Finally, unlike the present case, Frary had an employment contract containing a non-competition clause, a factor which presents a stronger basis for the trustees to deny the employee's request for accelerated benefits.

The court in *Frary* concluded that:

It is generally recognized that when, as in the present case, a plan is administered by the employer, the purpose of a policy of not granting early benefits to employees who terminate their employment relationship and then become employed with a competitor is to protect the employer.... [D]efendants have not offered *any* justification for their policy which serves an interest of the Plan's participants or beneficiaries. Hence, in view of defendants' duty to administer the Plan "*solely* in the interest of participants and beneficiaries," the Court finds the plaintiff is entitled to judgment as a matter of law. 29 U.S.C. § 1104.

*Id.* at 569.

The same rationale which guided the court in *Frary* supports the finding in the present case that Cohen is entitled to judgment. Defendants here have offered a justification, which they contend was adopted solely in the interest of the participants, for denying Cohen accelerated distribution. Defendants assert that their purported policy of discouraging employees from working for competitors provides an incidental benefit to the Plan by benefiting Bowne's business.

The court finds that the language of the statute demands more from the Trustees. It requires that the Plan be administered *solely,* not incidentally, for the participants. The reading of the statute suggested by defendants would justify almost any decision by the trustees which was in the interest of the employer as long as there was at least some "trickling down" of benefits to the plan participants.

Moreover, even were the court to accept defendants' contention that such a "policy" could benefit the Plan participants, the court finds the fact that the "policy" was never set forth in the Plan or disclosed to the participants completely undercuts defendants' position. At trial, Pite was unable to explain how such an undisclosed "policy" could operate to deter employees from leaving Bowne. Tr. 228. Furthermore, the court finds from the testimony

and evidence at trial that the Trustees' decision was based not upon any "policy," but upon the animosity they felt toward Morse for taking $2,000,000 of Bowne business to Pandick.[9] Tr. 236, 252.

Defendants have relied chiefly on the decision in *Fine v. Semet, supra,* where the court upheld the trustees' refusal to accelerate distribution of pension benefits to an attorney who left his law firm and entered into competition with it. As in the present case, in *Fine v. Semet* all previous requests for immediate payment of lump sum benefits had been granted. The court based its decision on its finding that "immediate payment of about $48,000 of the plan's $340,000 in assets would create a problem in making investment decisions and could cause a financial loss to the other participants." *Supra,* 699 F.2d at 1095.

The facts of that case, however, make the application of that ruling inapposite here. In the plan at issue in *Fine v. Semet,* the account balance of a terminated participant was not segregated from the assets of the plan, but were invested with the funds of the other participants. In addition, the plaintiff's interest in the plan was approximately fourteen percent of the entire assets of the plan. These two factors, not present in this case, compelled the *Fine v. Semet* court to find that withdrawal of the plaintiff's assets would seriously injure the plan's financial stability, and thus was not in the interest of the plan participants. In the present case, Cohen's account balance represents approximately 0.11% of the $12 million assets of the Plan, Tr. 42, and has been segregated from the assets of the Plan.

Because of the court's disposition of the issues in Cohen's favor, it does not need to reach the question whether the defendants' failure to disclose their purported policy was in itself a violation of ERISA.

## CONCLUSION

The court finds that the Trustees' decision was arbitrary and capricious. Their treatment of Cohen in departing from a consistently applied practice was improper as it was not done solely in the interests of the Plan participants. Accordingly, Cohen is entitled to judgment against defendant Bowne Profit-Sharing Trust in the amount of his account balance which has since July 2, 1981 been segregated and placed in an interest-bearing account. The claims against the other defendants are hereby dismissed, Cohen having offered no evidence as to their individual liability. The foregoing shall constitute the court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

SO ORDERED.

---

**9.** It is clear that Cohen had no direct influence on Bowne's business or profitability because he had little or no contact with customers and was not in a position to influence business to or from Bowne. Stipulated Fact (n). Thus, the Trustees cannot premise their decision on any loss of profits and incidental loss of benefits to Plan participants attributable to Cohen.