699 F.2d 1091
 4 Employee Benefits Ca 1273
 Martin FINE, Bernard Jacobson and Irwin J. Block, as
Trustees of the Pension Plan and the Profit
Sharing Plan of Fine, Jacobson, Block,
Goldberg & Semet, P.A.,
Plaintiffs-Appellees,
v.
Barry N. SEMET, Defendant-Appellant.
 Nos. 81-5246, 81-5312.
 United States Court of Appeals,
Eleventh Circuit.
 March 11, 1983.
 
 Bonnie Blaire, Coral Gables, Fla., Barry N. Semet, Miami, Fla., Malspeis, Lococo, Brown & Schwartz, North Miami, Fla., for defendant-appellant.
 Paul, Landy, Beiley, Harper & Metsch, Lawrence R. Metsch, Miami, Fla., for plaintiff-appellee.
 Appeals from the United States District Court for the Southern District of Florida.
 Before RONEY and CLARK, Circuit Judges, and TUTTLE, Senior Circuit Judge.
 RONEY, Circuit Judge:
 
 
 1
 In this suit arising from the breakup of a law firm, plaintiff trustees sought a declaration of their legal obligation to comply with defendant's demand for an immediate, lump sum payment of his accrued benefits in the firm's pension and profit sharing plans. The district court held that the plaintiffs could properly deny the demand. Fine v. Semet, 514 F.Supp. 34 (S.D.Fla.1981). We affirm.
 
 
 2
 The plaintiffs, stockholders in the law firm of Fine, Jacobson, Klein, Colan & Simon, P.A., formerly known as Fine, Jacobson, Block, Goldberg & Semet, P.A. ("the firm"), are trustees of the firm's pension and profit sharing plans ("the plans"). Defendant Semet, a lawyer, left the firm and requested the trustees to pay him a lump sum of approximately $48,500, his accrued benefits under the plans. The trustees denied defendant's request in writing and brought this declaratory judgment action.
 
 
 3
 The legal obligation of the trustees in this case is controlled by the provisions of the plans and the controlling statute. Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C.A. Sec. 1001 et seq. Both the pension and the profit sharing plans contain identical sections dealing with distributions if a participant ends employment with the firm prior to the normal retirement age. Section 5.03 of each instrument provides, among other things, that if the terminating participant is 100 percent vested, as was Semet, the Advisory Committee "in its sole discretion" may direct the trustee to commence payment of the accrued benefits.[1]
 
 
 4
 Although the agreement is thus couched in terms of absolute discretion, this Court has held that such broad grants of discretion do not give trustees unbounded or absolute authority in administering employee welfare plans. Their actions will not be sustained if they are proven to have been arbitrary and capricious. Bayles v. Central States, Southeast and Southwest Areas Pension Fund, 602 F.2d 97 (5th Cir.1979), binding on this circuit by the holding in Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).
 
 
 5
 ERISA does not require a more stringent standard of review. It does not prohibit the broad grant of discretion provided by Sec. 5.03. The Act imposes no obligation on a plan to pay benefits before an employee reaches normal retirement age. Any right to earlier benefits and a particular method of payment must be found in the individual agreements. See Pompano v. Michael Schiavone & Sons, Inc., 680 F.2d 911, 914 (2d Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 454, 74 L.Ed.2d ---- (1982).
 
 
 6
 Defendant Semet argues there was a policy of lump sum payments that makes the trustees' denial of Semet's request arbitrary and capricious. Semet concedes there was no written policy but claims that this decision, committed to the Advisory Committee's discretion in the agreement, became essentially mandatory due to a prior course of conduct. On previous occasions when participants ended their employment with the firm their requests for immediate, lump sum payments of accrued benefits were honored.
 
 
 7
 The district court found that the prior individual instances neither resulted from nor established a policy of making lump sum payments. This finding of fact by the district court is not clearly erroneous. No formal Advisory Committee existed or functioned before Semet's departure from the firm. Semet himself served as the firm's administrative partner and administered the plans on a day-to-day basis. Semet testified that his duties related to ministerial functions, he consulted with plaintiffs on all policy matters, and in 1976 a management committee took over policy matters relating to the plans and the firm. The district court found, however, that the firm management committee did not function as the Advisory Committee described in Sec. 5.03 of the plans. The plans were operated informally. The typical method of decisionmaking was for Semet to make the initial decision on both ministerial and policy matters and then to confer with the other management committee members. Based on this, the district court found that previous actions regarding lump sum payments were the result of Semet's own decisions, albeit with plaintiffs' informal authorization. He served as a one-person Advisory Committee.
 
 
 8
 The district court was properly hesitant to find that the plans as written had been modified to provide a mandatory policy of lump sum payments based on the informal actions of Semet himself. Cf. Hackett v. Pension Benefit Guaranty Corp., 486 F.Supp. 1357, 1362-63 (D.Md.1980) (where written pension plan required employer's consent to early retirement, that employer had routinely consented previously to such requests did not amount to waiver or modification of consent requirement). The previous decisions to make lump sum payments were made on a case-by-case basis and involved relatively small amounts. Between 1971 and 1979, eight employees, none of whom were stockholders in the firm, terminated their employment before reaching normal retirement age. With one exception, they each received a lump sum payment of their vested, accrued benefits. The amounts of the lump sum payments ranged from a low of a few hundred dollars to a high of about $5,000. Payment to one employee was deferred for a period of several months at her request. Such payments do not mandate a conclusion that a future Advisory Committee could not exercise the discretion vested in it by the plans to refuse a request for a lump sum payment if it determined that granting the request would be fiscally unwise. See Pompano v. Michael Schiavone & Sons, Inc., 680 F.2d 911 (2d Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 454, 74 L.Ed.2d ---- (1982). To hold otherwise would impair the flexibility necessary for proper financial management of such plans, a goal of Congress in holding ERISA fiduciaries to the "prudent man" standard. Joint Explanatory Statement of the Committee of Conference, H.Rep. No. 1280, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 5038, 5083-86; see Pompano, supra at 914.
 
 
 9
 Semet next argues that the trustees improperly withheld his accrued benefits as a bargaining tool to gain a favorable settlement of issues involved in a suit brought by Semet in state court. On August 15, 1979, before making the request for the lump sum payment, Semet had sued the firm in state court seeking specific performance of an agreement which required the firm to purchase Semet's stock. A second dispute involved the firm's purchase of Semet's interest in its building. The state court urged the parties to negotiate a settlement of these issues. Semet contends his former partners and their attorney consistently tied settlement of all the issues together, withholding payment of the accrued pension benefits as a wedge to force him to accept a lower price for his stock and interest in the office building. On the other hand, the attorney for the trustees testified it was Semet and his attorney who tied settlement of the state court suit to the lump sum payout Semet requested.
 
 
 10
 The district court thoroughly reviewed the conflicting testimony on this point and resolved the conflict in the trustees' favor because "no persuasive support exists for the allegation that improper leveraging was intended or attempted." 514 F.Supp. at 40. The testimony involved two differing versions of events, one recounted by Semet and his attorney and one by the trustees and their attorney. The court concluded that although Semet sincerely believed the trustees applied improper leveraging, the trustees held an equally sincere belief that unless they acceded to Semet's demand regarding accrued benefits, he would not agree to a settlement of the issues involved in the state court suit. The resolution of this conflict was properly in the domain of the trial court, and its decision was not clearly erroneous.
 
 
 11
 Finally, we focus on whether the trustees' articulated reasons for their treatment of Semet's request were so insufficient as to make their actions arbitrary and capricious. The district court found credible the testimony that the trustees premised their denial on a valid concern that immediate payment of about $48,000 of the plan's approximately $340,000 in assets would create a problem in making investment decisions and would cause a financial loss to the other participants. They concluded that Semet's request would have a greater impact on the plan's assets as a whole than had the previous requests.
 
 
 12
 Semet argues that a lump sum payment would have no effect on other participants. The trustees, however, indicated a desire to diversify the plans' investments. The Act imposes an affirmative obligation on them to do so. 29 U.S.C.A. Sec. 1104(a)(1)(C). The larger the amount of assets available, the more investment diversification possible. This could yield greater benefits for all participants, including those who have terminated employment but still have active accounts. ERISA imposes a duty on fiduciaries to act solely in the interest of plan participants and beneficiaries. 29 U.S.C.A. Sec. 1104(a)(1). In the court's view, the trustees' reasons were sufficient because of the broad "sole discretion" language of the agreement by which Semet is bound. The reasons need not be compelling, only sufficient to take them out of the arbitrary mold. The district court's ruling is not clearly erroneous.
 
 
 13
 The district court carefully considered all of Semet's arguments. The court reasonably applied standards regarding the burden of each party by holding that after Semet met his initial burden of offering evidence of facially inconsistent treatment, the burden shifted to the trustees to show why they acted as they did. The court resolved all credibility choices in favor of the trustees. Having carefully considered oral argument, the briefs, and the record, we find no reversible error.
 
 
 14
 The plaintiff-trustees cross appeal the district court's denial of attorney's fees. ERISA provides that "[i]n any action under this subchapter by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C.A. Sec. 1132(g). The question is whether the district court abused its discretion in denying the fee award. This standard of review permits an area of decision in which a district court could go either way without reversal on review. See Johnson v. Mississippi, 606 F.2d 635, 637 (5th Cir.1979).
 
 
 15
 The court thoroughly analyzed each of the factors outlined by the former Fifth Circuit in Iron Workers Local No. 272 v. Bowen, 624 F.2d 1255, 1266 (5th Cir.1980), for determining whether a fee award is appropriate in an action under ERISA. It entered findings of fact as to each element, which are supported by the record. Semet's defense of the lawsuit was neither frivolous nor entered in bad faith, and may well have benefited other participants in the plan. We find no abuse of the discretion allowed to the trial court in its denial of attorney's fees. Each party will bear its own costs on appeal.
 
 
 16
 AFFIRMED.
 
 CLARK, Circuit Judge, dissenting:
 
 17
 Instead of affirming the district court's decision, I would remand. There was no evidence to support the district court's conclusion, which was adopted in the majority opinion.
 
 
 18
 I certainly agree that the district court was correct in concluding that Semet had shown that his treatment was facially inconsistent with the treatment of earlier departing plan participants. Further, in light of this discriminatory treatment, the district court was correct in holding that the appellees' refusal to distribute to Semet his vested benefits shifted the burden of proof to the appellees to establish that their actions were consistent with their fiduciary duties under ERISA.
 
 
 19
 Despite this recognition of the trustees' burden, the district court concluded that their denial of the lump sum distribution was neither arbitrary nor capricious upon the sole basis of the testimony of the trustees themselves. The district court's opinion states in part as follows:
 
 
 20
 ... [T]heir [the trustees'] decision ... was supported by their valid concern that immediate payment of more than $48,000.00 of the Plans' approximately $340,000.00 in assets would create a "problem in making investment decisions" and could cause a "financial loss to the other participants." Plaintiffs' Exhibit 9.... While relatively small lump sum payments over a course of years are unlikely to impact adversely on investment decisions or profitability, the same cannot be said of a sudden loss of some 14% of the Plans, combined with the significant potential for additional requests for immediate payments which are substantial in total.
 
 
 21
 514 F.Supp. 34, 43.
 
 
 22
 The majority opinion, with the following language, joins in this factually unsupported investment analysis: "The larger the amount of assets, the more investment diversification possible. This could yield greater benefits for all participants...." At 1095.
 
 
 23
 I do agree that fiduciaries should diversify investments, and manage plans "solely in the interest of the participants and beneficiaries." 29 U.S.C.A. Sec. 1104. Nonetheless, I believe justice requires a remand because there was no testimony from any investment advisors, analysts, or similar experts to support the trustees' conclusions. The only evidence in the record was given by the trustees themselves, who are lawyers, former partners of Semet, and who had interests adverse to his, as reflected by the record. The record does not show that these lawyers had expertise as investment analysts. Nor may the district court take judicial notice of what is sound investment policy under Fed.R.Evid. 201.
 
 
 24
 Indeed, the evidence and the trustees' testimony hardly display financial finesse. The evidence showed that the fund had approximately $340,000.00 in assets and Semet's share would have been $48,000.00. One investment was a $300,000.00 certificate of deposit with a March 1981 maturity date and the balance was in miscellaneous stocks, bonds and savings deposits. Attorney Jacobson testified as to possible future handling of the plan: "We would have to diversify and have enough money to invest in real estate, which is a traditional inflation hedge." Any real estate investment could well consume a sizable part of the plans' funds, making it difficult to meet the statute's diversification requirement and prudent man standard. 29 U.S.C.A. Sec. 1104(a)(1)(B).
 
 
 25
 Testimony reflected that contributions to the plans amounted to approximately $45,000.00 per year. Evidence based upon technical investment knowledge was necessary to demonstrate that, in the midst of such relative liquidity, distribution to Semet of his lump sum would have had adverse impact on the fund and on the interests of the plans' other participants and beneficiaries. There was no such evidence. Thus, the district court's conclusion, "Here the trustees validly premised different treatment [of Semet] on consideration of the greater impact Semet's request would have on the plan assets as a whole," 514 F.Supp. at 44, has no support.
 
 
 26
 One of the cases relied upon by the majority is Pompano v. Michael Schiavone & Sons, Inc., 680 F.2d 911, 915 (2d Cir.1982). In that case there was evidence that the plans' actuaries had advised the Pension Committee not to make lump sum payments. Thus, "[t]he court found that the Committee did not follow an arbitrary path, but instead listened to advice from its actuaries in formulating this policy." 680 F.2d at 915. There was no such evidence in the present case.
 
 
 27
 The present case is similar to that of Frary v. Shorr Paper Products, Inc., 494 F.Supp. 565 (N.D.Ill.1980). There plaintiff, when leaving the employment of Shorr, sought distribution of his share of a plan on the ground that Shorr had in the past honored other departing participants' requests that they receive their interests in the plan at the time of their departure, rather than at retirement age. In Frary, as in the present case, the district court held that a plan's manager could not treat employees in a discriminatory fashion and that the plan could not be administered arbitrarily or capriciously. The facts were undisputed that Shorr would not distribute to Frary his benefits because Frary had taken employment with a competitor. Holding for the plaintiff, the court found: "Indeed, defendants have not offered any justification for their policy which serves an interest of the Plan's participants or beneficiaries." 494 F.Supp. at 569. The trustees in the instant case, providing no expert testimony, similarly have offered no justification for their policy.
 
 
 28
 My concern is that the trustees of small businesses' contribution plans, with no more than an unsubstantiated invocation of certain notions of investment, will exercise unfair leverage over departing employees. Such leverage was exercised in the present case as it was in Frary. The majority opinion gives a green light to fiduciaries to discriminate against a departing employee without being required to prove harmful impact upon the plan and its remaining participants.
 
 
 
 [1]
 Section 5.03 of each of the plans provides in pertinent part:
 TERMINATION OF SERVICE PRIOR TO NORMAL RETIREMENT AGE
 Upon termination of a Participant's employment prior to attaining Normal Retirement Age (for any reason other than death or disability), a Participant may elect, upon the consent of the Advisory Committee, to direct the Trustee to commence payment to the Participant of his Nonforfeitable Accrued Benefit prior to the Participant's attaining Normal Retirement Age. The Advisory Committee must give its direction to the Trustee on or before the last day of the Plan Year in which the Participant first incurs a Break in Service as a result of the termination of his employment.... If the terminating Participant is one hundred percent (100%) vested in his Accrued Benefit by the close of the Plan Year in which his employment terminates, the Advisory Committee, in its sole discretion, may direct the Trustee to commence payment to the Participant of his Accrued Benefit within sixty (60) days after the close of the Plan Year in which the Participant's employment terminates without regard to the Participant's incurring a Break in Service ....
 If the Advisory Committee does not give the Trustee a direction to commence payment, the Trustee shall continue to hold the Participant's Accrued Benefit in trust until the close of the Plan Year in which the Participant attains Normal Retirement Age. At that time, the Trustee shall commence payment of the Participant's Nonforfeitable Accrued Benefit in accord with the provisions of Article VI....
 If the Participant terminates employment prior to attaining Normal Retirement Age because of death or disability, the Advisory Committee shall direct the Trustee to commence payment of the Participant's Accrued Benefit to him (or to his Beneficiary, if the Participant is deceased), in accord with the provisions of Section 6.02, within sixty (60) days after the close of the Plan Year in which the Participant's employment terminates. [Deleted portions relate to date payment is to be made if directed by the Advisory Committee and calculation of benefits at the close of a plan year.] (Emphasis added).