**Michael Don ROMACHO, Plaintiff,**

v.

**Edmund A. STANLEY, Jr.; Victor Simonte, Jr.; Franz Von Ziegesar; and Carl R. Pite, Individually and in their capacity as Trustees of the Bowne Profit-Sharing Trust; and Bowne Profit-Sharing Trust, Defendants.**

No. 82 Civ. 211.

United States District Court,
S.D. New York.

July 21, 1983.

Hertzog Calamari & Gleason, New York City, for plaintiff; Loretta A. Preska, New York City, of counsel.

Simpson Thacher & Bartlett, New York City, for defendant; John W. Ohlweiler, New York City, of counsel.

## OPINION FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

Plaintiff, Michael Don Romacho, a former employee of Bowne of New York, Inc. ("Bowne"), commenced this action against the Trustees of the Bowne Profit-Sharing Plan and Trust (the "Plan") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA")[1] because of their refusal to accelerate distribution of his vested interest in the Plan's fund ("Fund") on the termination of his employment. Two other former employees of Bowne brought similar actions against the Trustees in this Court with differing re-

[1]. 29 U.S.C. § 1001, *et seq.*

sults.[2] This Court, upon the totality of the record before it, concludes that the Trustees' denial of plaintiff's claim for immediate payment of his retirement benefits, which are not due until his 65th birthday, was not arbitrary or capricious and that their determination was rationally made and in good faith.

Bowne is a New York corporation with subsidiaries in various locations in the United States. It engages primarily in financial and corporate printing.[3] Plaintiff was employed in the production department of the New York subsidiary from May 5, 1968 to July 11, 1980, when, at the age of 33, he voluntarily resigned to accept employment with Pandick Press, Inc. ("Pandick"). Pandick is a direct competitor of Bowne, located in the same building.

Approximately two weeks before plaintiff resigned, John Morse, Vice President of Sales and one of the most successful salesmen at Bowne, accepted employment with Pandick. Morse took with him to Pandick a large volume of Bowne's business, the Unit Investment Trust Work, a profitable account with revenues of between two and two and one-half million dollars per year. After Morse's move to Pandick, the Bowne customers moved their business there and because of Romacho's familiarity with the Unit Investment Trust Work, Morse, shortly after his own resignation recruited Romacho to join him at Pandick. Morse later recruited another Bowne employee, Robert Cohen, to join Pandick, also to work in part for those same clients who had switched from Bowne to Pandick when Morse made his move. Cohen, whose position at Bowne was pricing analyst, joined Pandick in March 1981.

The Bowne Plan is a deferred profit sharing plan funded by contributions from the profits of participating Bowne subsidiaries. There is no employee contribution. The Plan was established in 1961 and amended several times thereafter. The 1972 version of the Plan contained a "forfeiture provision," which in substance provided that if a participant in the Plan left the employ of Bowne to enter into competition with it or became an employee of a direct competitor, he ceased to be a participant in the Plan and forfeited his interest therein, whether vested or not.[4] To comply with the requirements of ERISA, the Plan was restated in June 1977 and the forfeiture provision was deleted.

Plaintiff was a participant in the Plan at the time of his resignation and had a vested interest in the sum of $47,481.59. The Plan then in effect provides that vested profit-sharing benefits shall be paid within sixty days after the *later* of:

(a) the earlier of the participant's Normal Retirement Date (age 65), or Early Retirement Date (at least age 60 upon completion of 30 years of service);

or

(b) the date of the participant's termination from employment.[5]

**2.** *Cohen v. Stanley*, 82 Civ. 210 (DNE) (June 20, 1983) (in favor of employee); *Morse v. Stanley*, 81 Civ. 884 (RO) (July 12, 1983) (in favor of Trustees). Cohen's vested benefits amounted to $13,759.23, and Morse's to about $200,000.

Although the Trustees in each action were represented by the same firm of attorneys, and the same attorneys represented two of the three plaintiffs, no motion to consolidate, pursuant to Fed.R.Civ.P. 42(a), was made. That three separate trials involving common questions of law or fact were conducted before three separate judges instead of a single consolidated action was a needless waste of judicial time and effort.

**3.** While Bowne also engages in commercial and legal printing and in providing computer text time-sharing services, the parties have stipulated that its primary business is financial printing. *See* Pretrial Order, Stipulated Fact (1).

**4.** Between 1972 and 1977, three employees forfeited their entire account balance pursuant to the forfeiture clause. The names of these employees and the amount they forfeited are as follows: Mr. Osann forfeited $99,057.22 in 1973; Mr. Whitehill forfeited $42,628.68 in 1973; and Mr. Strauss forfeited $10,373.02 in 1975.

**5.** Article 8.1(A).

When Romacho left Bowne's employ he was 33 years of age and had twelve years' service. Thus, he is not entitled to receive his vested benefits until age 65, his normal retirement age. However, the Plan provides that the Trustees may establish procedures to make distribution of benefits to a terminated participant at a date prior to an employee's attainment of age 65 or earlier retirement date.[6] The Plan further grants authority to the Trustees to construe and interpret the provisions of the agreement and provides that

> [a]ny decision or act made or done by the Trustees pursuant to any provision of the Plan shall be in their sole and absolute discretion.[7]

A summary booklet entitled "Highlights of the Bowne Profit Sharing Plan for Employees of Participating Companies of Bowne & Co., Inc." (the "Summary") was distributed to all Plan participants, including Romacho. In addition to describing the mandatory payment provisions at normal and early retirement dates, the Summary states that "[t]he method and time of making payment shall be determined by the Trustees in their sole discretion...."

From the time of the restatement of the Plan in 1977 until Romacho and Morse sought acceleration, seventy-nine Plan participants who left Bowne requested and were granted accelerated payment of the vested amount in their Plan account. The amounts paid to these former employees ranged from $45.92 to $70,236.83. Nine of the former employees received payments in excess of $10,000. Whether any of these nine were employed by "direct competitors" of Bowne is a matter of dispute between

the parties, which will be discussed hereafter.

Shortly after his resignation, plaintiff asked the Trustees to exercise their discretion to grant him immediate lump sum payment of his account balance. On September 3, 1980, the Trustees met to consider plaintiff's request as well as Morse's. On September 25, 1980, the Trustees denied both applications. On that same day, one of the Trustees, Carl Pite, notified plaintiff that his request had been denied due to his immediate subsequent employment with a competitor. Romacho sought and was granted a review of the decision. Pite, on January 5, 1981, informed him that the Trustees reaffirmed their original denial because it was their policy, in their discretion, not to accelerate payments in cases where a former employee has joined a competitor. Romacho responded that he knew of several former Bowne employees who, in his view, had gone to work for competitors but nonetheless received accelerated distribution under the Plan. Pite replied on January 28, 1981 that the "trustees have not in the past approved accelerated payment of account balances to former employees who had in excess of $10,000 due and who left the employ of [Bowne] to work for a competitor." Thereafter, plaintiff commenced the instant action.

■ The Plan's provision which mandates the distribution of plaintiff's interest only upon reaching age 65 complies with ERISA.[8] "[I]t does no violence to the scheme of the Act ... to withhold benefits from plaintiff until plaintiff reaches age sixty-five."[9] So, too, the grant of broad discretion to the Trustees to authorize payment earlier than the latest date mandated

---

6. Article 8.1(B).

7. Article 12.5(B).

8. See 29 U.S.C. § 1096; Hauck v. Eschbacher, 665 F.2d 843, 848 n. 9 (8th Cir.1981); Tanuggi v. Grolier, Inc., 471 F.Supp. 1209, 1216–17 (S.D.

N.Y.1979); Riley v. MEBA Pension Trust, 452 F.Supp. 117, 120–21 (S.D.N.Y.), aff'd, 586 F.2d 968, 972 (2d Cir.1978).

9. Riley v. MEBA Pension Trust, 452 F.Supp. 117, 120 (S.D.N.Y.), aff'd, 586 F.2d 968 (2d Cir.1978).

by ERISA and the Plan is consistent with ERISA.[10] Plaintiff advances a variety of arguments as to why he is entitled to his benefits now despite the Trustees' denial of his request pursuant to their lawful discretion. First, he contends that the Trustees had adopted a policy and practice of consistently granting accelerated distributions upon the request of terminated employees and thus in refusing plaintiff's request they failed to comply with the established procedures and to administer the Plan according to its terms in violation of section 404(a)(1)(D) of ERISA.[11] The argument is without merit. Under the express terms of the Plan, as outlined earlier, distribution of plaintiff's benefit is mandated only when he reaches 65. Earlier payment is a matter of discretion with the Trustees. The Plan does not specify guidelines as to when the Trustees are to invoke or deny acceleration. The exercise of discretion favorably to terminated participants in the past does not constitute a waiver of the Trustees' discretion, expressly vested in them by the Plan, to deny earlier distribution in those instances where in their judgment upon the particular facts it would be detrimental to the Plan and to the interests of other participants. To hold otherwise would read out of the Plan discretionary powers expressly granted to the Trustees and would impair the flexibility necessary for proper management of pension plans.[12]

Thus we reach plaintiff's further contention that the Trustees' denial of his request was arbitrary and capricious. Our Court of Appeals has recently stated the standard applicable to reviewing the discretionary decisions of pension plan administrators as follows:

> In order to avoid excessive judicial interference with pension plan administration, the federal courts of appeals have generally applied an 'arbitrary and capricious' standard of review in actions challenging the decisions of plan administrators .... We have stated that the lawful, discretionary acts of a pension committee should not be disturbed, absent a showing of bad faith or arbitrariness.[13]

■ Plaintiff contends that the Trustees' denial of his request was arbitrary and capricious because every similarly situated participant who left Bowne from 1977, following the restatement of the Plan, until his and Morse's departures in 1980 received accelerated distribution upon request. The Trustees contend that none of these persons was similarly situated to Romacho in that they either did not have more than $10,000 in their accounts or, if they did, they did not immediately enter the employ of a company which the Trustees considered an "effective" or "major" or "direct"[14] competitor. The issue here is who is properly considered a "competitor" of Bowne. As stated by one of the Trustees, "it's the Trustees who determine whether someone is going to a competitor that could adversely affect the Plan

---

**10.** *See Fine v. Semet,* 699 F.2d 1091, 1093 (11th Cir.1983); *Pompano v. Michael Schiavone & Sons, Inc.,* 680 F.2d 911, 914 (2d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982); *Yarden v. Sherman Manufacturing Co.,* 80 Civ. 3637 (S.D.N.Y.1980) (Leval, J.).

**11.** 29 U.S.C. § 1104(a)(1)(D).

**12.** *See Fine v. Semet,* 699 F.2d 1091, 1094 (11th Cir.1983). *See also Pompano v. Michael Schiavone & Sons, Inc.,* 680 F.2d 911, 914 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982); *Hackett v. Pension Benefit Guaranty Corp.,* 486 F.Supp. 1357, 1362–63 (D.Md.1980).

**13.** *Miles v. N.Y. State Teamsters Conference,* 698 F.2d 593, 599 (2d Cir.1983). *See also Den-*

*nard v. Richards Group, Inc.,* 681 F.2d 306, 313 n. 11 (5th Cir.1982); *Pompano v. Michael Schiavone & Sons, Inc.,* 680 F.2d 911, 915 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982); *Haeberle v. Board of Trustees of Buffalo Carpenters,* 624 F.2d 1132, 1136 n. 6 (2d Cir.1980); *Riley v. MEBA Pension Trust,* 570 F.2d 406, 410 (2d Cir.1977); *Wyper v. Providence Washington Ins. Co.,* 533 F.2d 57, 62 (2d Cir.1976); *Beam v. International Org. of Masters, Mates & Pilots,* 511 F.2d 975, 980 (2d Cir.1975).

**14.** Tr. at 125, 134.

and not the individual participant."[15] Plaintiff defines a competitor more broadly than do the Trustees. Since the discretion is vested in the Trustees by the Plan, it is their definition which controls, provided their explanation of why they did not consider certain companies to be competitors is rational. The Court is satisfied that in each of the instances testified to at trial the Trustees provided a rational and credible explanation as to why they did not consider that a particular individual had joined a "direct" competitor. These other companies either served a geographical area in which Bowne did little business or they dealt in the type of services which was related to but not considered competitive with Bowne, or at the time involved were not a "major" or "effective" threat to Bowne. Romacho's case and Morse's were the first since 1977 where participants with more than $10,000 in vested benefits joined a company which the Trustees considered a direct competitor, in consequence of which they did not grant accelerated distribution. Since plaintiff's case, several others,[16] including Cohen, have arisen which fall into the same category and the Trustees have denied these requests, too. Thus the Trustees have applied their policy with an even hand to all those similarly situated as plaintiff.

Moreover, the policy itself is both rational and consistent with the Trustees' statutory duty to administer the Plan "solely in the interests of the participants and the beneficiaries and . . . for the exclusive purpose of providing benefits to participants and their beneficiaries."[17] The Plan is a profit sharing trust funded entirely by contributions from the profits of participating Bowne companies. The amount of contributions to the Plan thus depends on the continuing financial success of the sponsoring companies. Their continued economic viability is in the interest and welfare of all participants in the Fund. The trial evidence made it clear that the purpose of taking into account subsequent employment by a direct competitor when considering a former employee's request for accelerated payment is to ensure the financial stability of the Plan by encouraging employees to remain with Bowne. It is unnecessary to examine the precise effect which plaintiff's departure had on the profits of Bowne and contributions to the Plan because "the judicial role is limited to determining whether the Trustees' interpretation was made rationally and in good faith—not whether it was right."[18] It is surely rational to adopt a policy of encouraging employees to stay with Bowne, thereby discouraging competitive raiding which in the aggregate might have a substantial impact on Bowne's profits and, derivatively, the fiscal health of the Plan. Whatever the Trustees' policy was with respect to individual applications in the past, it did not become "frozen" so that they surrendered their discretionary power when subsequent individual cases presented new facts. The Trustees were dealing with fact and not fiction. Morse was a top salesman at Bowne and efforts to persuade him to remain with Bowne failed. As already noted, his departure meant the loss to Bowne of an account of more than two million dollars. Morse induced Romacho to join Pandick and thereafter Cohen also left to join that competitor. Under the circumstances, it was not an unreasonable assumption that other Bowne employees might be induced to leave Bowne and join Pandick. A mass exodus of Bowne's employees contained a potential threat to the growth and

---

**15.** Tr. at 83.

**16.** These others include Robert Schvey and Tom Marenyi, who joined Packard Press in 1982.

**17.** 29 U.S.C. § 1104(a)(1)(A).

**18.** *Riley v. MEBA Pension Trust,* 570 F.2d 406, 410 (2d Cir.1977). *See also Fine v. Semet,* 699 F.2d 1091, 1095 (11th Cir.1983) ("[T]he trustees' reasons were sufficient because of the broad 'sole discretion' language of the agreement . . . . The reasons need not be compelling, only sufficient to take them out of the arbitrary mold.")

the fiscal integrity of the Fund. A disincentive to stem termination of employment by refusing to grant accelerated payments was not an unreasonable exercise of the Trustees' discretion since it reduced the prospect of a drop in Bowne's earnings with consequent diminished contributions to the Fund, and the impairment of the interests of other participants. Under the circumstances, the Trustees were not required, whatever their past policy may have been, to rigidly adhere to that policy. The Trustees here have affirmatively justified their denial of plaintiff's request by protecting the interests of all the participants and beneficiaries of the Plan.

Plaintiff argues that their action was designed solely to benefit Bowne and to punish him for having joined Morse at Pandick. As the above discussion makes clear, however, the Trustees have established that they acted in good faith because of their concern that continued competitive raiding of Bowne's employees would have a detrimental impact on the Plan and its other participants. That such a policy may incidentally benefit Bowne by influencing other employees to remain, does not require a finding that the Trustees breached their fiduciary duty under ERISA. In *Donovan v. Bierwirth,* Judge Friendly stated:

> [T]rustees of [a] . . . plan do not violate their duties as trustees by taking action which, after careful and impartial investigation, they reasonably conclude best to promote the interests of participants and beneficiaries simply because it incidentally benefits the corporation . . . [provided their] decisions [are] . . . made with an eye single to the interests of the participants and the beneficiaries.[19]

The Trustees' fiduciary duty extended not only to the plaintiff but to all other participants in the Plan. Here plaintiff was seeking to accelerate a benefit to which he was not entitled as of right for a period of almost thirty years. Those who remain with Bowne and also are participants cannot obtain their benefits until age 60 at the earliest, assuming thirty years' service. It was not unfair or inequitable under all the circumstances for the Trustees to adopt a policy of refusing to advance benefits to plaintiff and others similarly situated when to do so presented the prospect of imperilling the interests of participants who remained with Bowne. The two Trustees who testified at trial put forward rational explanations for their decision,[20] and under all the circumstances, including demeanor evidence, the Court finds credible their denial of any improper punitive motive in acting as they did.

Plaintiff further argues that the Trustees' failure to disclose their policy in advance undercuts their contention that the purported purpose of the policy was to deter employees from leaving Bowne. Employees cannot be deterred, plaintiff contends, by a policy of which they are unaware. This argument overlooks the fact that plaintiff's and Morse's cases were the first time since the 1977 amendment of the Plan that the Trustees had to decide whether to grant accelerated payment to persons with large balances who joined direct competitors. The Trustees may use their discretion to forge policy on a case by case basis and make decisions with an eye towards the future. Once disclosed through the denial of Morse's and Romacho's requests, the policy may have its intended deterrent effect in the future even though it did not have such an effect in plaintiff's case.

---

**19.** 680 F.2d 263, 271 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982).

**20.** Because here the Trustees have justified their decision to deny accelerated distribution, plaintiff's reliance on *Frary v. Shorr Paper Products, Inc.,* 494 F.Supp. 565 (N.D.Ill.1980), is misplaced. In *Frary,* the Court granted plaintiff's motion for summary judgment since the defendants not only failed to offer "any justification for their policy which serves an interest of the Plan's participants or beneficiaries," but admitted that their "policy is, in effect, designed to punish employees who assume employment with a competitor and thereby breach their employment agreements." *Id.* at 569.

The $10,000 limitation established by the Trustees is also rational. They explained that overseeing a large number of small accounts which have been segregated from the rest of the Fund, as required by the Plan when distribution is deferred, imposes an administrative burden with consequent expense to the Plan. Avoiding such expense is consistent with the statutory duty of a fiduciary to defray reasonable expenses incurred in administering a plan.[21] The Trustees also explained that until recently it was difficult to obtain competitive interest rates for investments of less than $10,-000 in individual bank accounts as required by Article 8.1(D), and further, that they considered that when a participant's benefits are relatively small, the withholding of immediate payment would not significantly affect that individual's decision whether to remain in employment or leave.

Plaintiff contends that even if the Trustees' action was not arbitrary and capricious or a breach of their fiduciary duty, it is inequitable to permit them to apply to him their policy of denying early payment to participants with more than $10,000 who join competitors because they did not disclose this policy in advance. He argues that the nondisclosure violates ERISA[22] and misled participants because after the 1977 deletion of the forfeiture provision, the employees understood that all persons who left Bowne would receive immediate payment of their benefit regardless for whom they went to work.

First, as a factual matter, plaintiff has not shown that the Plan participants were misled. He testified that he was misled;[23] but he conceded that he had never been told by any official or management employee that he would receive accelerated distribution if he left Bowne. Indeed, quite to the contrary, the Plan and Summary made crystal clear that this was a matter of the sole discretion with the Trustees. Plaintiff acknowledged that he read the statement in the Summary and was aware that acceleration of benefits was in the discretion of the Trustees. Moreover, although a full and complete copy of the Plan is available to participants upon request, Romacho, during his employment at Bowne, never asked for a copy.

More importantly, plaintiff misconceives what must be disclosed under ERISA. The fact that the Trustees had discretionary power to grant early payment was clearly communicated to participants, and no more is required. In *Pompano v. Michael Schiavone & Sons, Inc.,*[24] the Second Circuit sustained the right of a pension committee to refuse to award lump sum payment of pension benefits where the plan gave the committee discretion in the matter. The Court rejected plaintiff's contention that the Plan and Summary, which simply said that the lump sum option was available only with the approval of the pension committee, should have spelled out in greater detail the factors to be considered by the committee in making its determination. The Court stated:

> ERISA provides that a "summary plan description of any employee benefit plan" must . . . be "written in a manner calculated to be understood by the average plan participant . . . sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan . . . ." The Plan, which made a lump sum payment available only with prior approval of the Committee, was written up in summary form in simple and unmistakable language easy enough for

---

**21.** 29 U.S.C. § 1104(a)(1)(A)(ii).

**22.** *See* 29 U.S.C. §§ 1021(a), 1022(a)(1).

**23.** Robert Cohen, the third employee who joined Morse at Pandick, also testified that he was misled, but this testimony is unconvincing because by the time Cohen left he knew that

Morse's and Romacho's requests had been denied.

**24.** 680 F.2d 911 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982).

the average plan participant to be reasonably apprised of his rights and obligations under the Plan.[25]

The Court's rationale was that any greater specificity would "undercut the flexibility essential to effective and responsible financial management of the plan."[26] Indeed, the Trustees here testified that they had made efforts to put into writing factors which they would use as guidelines in exercising their discretion but abandoned the project because they felt it could foreclose the fair disposition of individual cases presenting unusual or difficult problems. They wanted to be free to consider a host of relevant factors in addition to competitive activity and size of account balance, such as whether the former employee or a member of his family was ill or facing some financial hardship, and considered that drawing up an exhaustive list might foreclose consideration of worthy and compelling individual cases.

■ One final contention raised by plaintiff remains to be addressed. On October 3, 1980, eight days after the Trustees made their initial decision to deny the request, plaintiff's interest in the Plan was segregated from the funds of the remaining participants and was deposited in an account at Chase Manhattan Bank pursuant to Article 8.1(D) of the Plan. That Article provides:

> Where there is a deferral of distribution (either in whole or in part) for at least three (3) months, the amount to be so deferred shall be segregated into a savings account under a Bank as selected by the Trustees until distributed and, therefore, such distribution shall include interest credited under the savings account. The amounts so segregated shall be increased for interest at the prevailing rate for the period of deferral preceding segregation.

Plaintiff argues that this provision requires that his account balance be increased for interest at the prevailing rate for the period

from April 30, 1980, the last valuation date for his account, until October 3, 1980, the date when plaintiff's balance was segregated from the fund and placed in an interest bearing account. Mr. Pite, one of the Trustees, testified that the Trustees interpret Article 8.1(D) to require segregation of a participant's balance, determined as of the last valuation date, "as soon as [is] practicable" after the Trustees have decided to deny his request for accelerated distribution.

Under Article 12.5 the Trustees "have the right ... to construe and interpret the provisions of this agreement, and they may resolve any ambiguity, supply any omission, and resolve any inconsistency in such manner as they deem fair and proper." Given the Trustees' authority in interpreting the Plan, and given that plaintiff's request was acted upon promptly and that his balance was segregated eight days after the decision to deny his request, the Court finds that the Trustees did not violate Article 8.1(D).

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

Judgment may be entered in favor of the defendants dismissing the complaint upon the merits.