Edward J. DAVIS; William P. Creighton; Lindsey Boone; Keith Anderson; Aubrey West, Plaintiffs–Appellees,

v.

BURLINGTON INDUSTRIES, INCORPORATED; the Retirement System of Burlington Industries, Incorporated, and Affiliated Companies; the Board of Administration of the Retirement System of Burlington Industries, Incorporated, and Affiliated Companies, Defendants–Appellants.

No. 91–1725.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 29, 1991.

Decided June 8, 1992.

---

Richard James Wertheimer, Arnold & Porter, Washington, D.C. (argued), for defendants-appellants (Hubert Humphrey, Brooks, Pierce, Mclendon, Humphrey & Leonard, Greensboro, N.C., William L. Rikard, Jr., Parker, Poe, Adams & Bernstein, Charlotte, N.C., on brief).

James P. Cooney, III, Kennedy, Covington, Lobdell & Hickman, Charlotte, N.C. (argued), for plaintiffs-appellees (Kiran H. Mehta, Charlotte, N.C., Edgar R. Bain, Bain & Marshall, Lillington, N.C., on brief).

Before WIDENER and HAMILTON, Circuit Judges, and HEANEY, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

## OPINION

HEANEY, Senior Circuit Judge:

Defendant-appellant Burlington Industries (Burlington) provided a retirement plan for its employees; the Board of Administration (Board), another defendant-appellant, operated that plan. The plaintiff-appellees, a group of former Burlington employees, claim that the defendants violated the "anti-cutback" provision of the Employee Retirement Income Security Act of 1974 (ERISA). The district court agreed and granted them summary judgment. We affirm.

### Background

In mid–1987, investment bankers proposed a leveraged buyout of Burlington Industries. Burlington's management agreed to the leveraged buyout. The management knew at the time that the cash flow from Burlington's operations would not generate enough income to service the enormous debt ($2.8 billion) that would be created by the buyout. It was understood by the parties that Burlington would sell many of its operations to service the debt.

The leveraged buyout occurred on September 3, 1987. As planned, Burlington sold a number of its operations shortly thereafter to service the debt. These sales created many "same-desk" employees: Burlington employees whose plant or division had been sold but who continued to work after the sale in the same job for the new purchaser of the plant or division.

The plaintiff class is composed of these same-desk employees who participated in the Burlington retirement plan. It is un-

disputed that they are entitled to retirement benefits now that they are no longer in Burlington's employ; the question before us is whether they can receive the benefits now or whether they have to wait until after they leave the employ of the companies for whom they now work.

Burlington's Board of Directors amended the retirement plan on September 3, 1987, the same day the leveraged buyout occurred. Because these amendments are the heart of the case, we set forth (where appropriate) the relevant sections of the retirement plan as they existed before and after the amendments.

Before the 1987 amendments, article VI of the plan provided that upon leaving Burlington's employ, employees 55 and over would be "fully vested" and "entitled" to full retirement benefits.[1] Article VII, entitled, "Benefits Upon Severance of Employment Prior to Age 55," provided that an employee who left Burlington's employ due to the closing or sale of a plant or operating division was "entitled" to receive a full "Service Retirement Pension" without regard to his vested percentage.[2] Before the 1987 amendments, article XI, entitled "Payment of Benefits," stated that "payment of benefits shall commence not later than 60 days after the close of the Plan Year in which the Member's service with the Companies is terminated."[3]

The 1987 amendments to the plan modified these provisions by adding clauses which stated that retirement benefits would be paid upon the member's termination from the *purchaser* of the member's subsidiary rather than upon termination from Burlington.[4] This change prevented

---

1. Before 1987, article VI of the plan set forth benefit entitlements for those leaving Burlington after age 55 as follows:

   *Section 6.1*—A Member shall ordinarily be retired on his Normal Retirement Date; however, any Member who leaves the employ of the Companies after attaining age 55 shall be fully vested and shall be considered to have retired and shall be entitled to benefits as provided in this Article.
   *Section 6.2*—Upon retirement a Member shall be entitled to receive a Service Retirement Pension.
   Section 6.3 gave members the option of receiving their benefits in a different form (*e.g.,* lump sum payment) than the standard Service Retirement Pension.

2. Before 1987, article VII set forth the following concerning benefit entitlements for those who left Burlington's employ before age 55:

   *Section 7.1*—A Member whose employment with the Companies is terminated prior to his attaining age 55 for reasons other than death, disability, lack of work, or the closing or sale of a plant or operating division, as determined by the Board, shall be entitled to receive a Service Retirement Pension as defined in Section 2.22.
   In lieu of the pension herein provided, the Member may elect to receive his benefits under any one of the options provided in Section 6.3, subject to any requirement for spousal consent specified in Subsection 11.1(b).
   *Section 7.2*—A Member whose employment is terminated prior to his attaining age 55 due to lack of work, or due to the closing or sale of a plant or operating division, as determined by the Board, shall be entitled to receive 100% of the benefits described in Section 7.1 without regard to his vested percentage....

3. *Section 11.3*—Unless a Member entitled to benefits elects by written request submitted to the Board that the payment of benefits hereunder commence at a later date, the payment of benefits shall commence not later than 60 days after the close of the Plan Year in which the Member's service with the Companies is terminated. If the amount of the payment required to commence on the date determined under this Section cannot be ascertained by such date, or if it is not possible to make such payment on such date because the Member cannot be located, a payment retroactive to such date shall be made no later than 60 days after the earliest date on which the amount of such payment can be determined or the date on which the Member is located....

4. We set forth the 1987 amendments in bold face type:

   *Section 6.1*—A Member shall ordinarily be retired on his Normal Retirement Date; however, any Member who leaves the employ of the Companies after attaining age 55 shall be fully vested and shall be considered to have retired and shall be entitled to benefits as provided in this Article, **provided, however, in the case of a Member (1) whose employment is terminated because of the sale of a plant, operating division or Affiliated Company and (2) who within 90 days after such termination becomes employed by the purchaser or transferee of such plant, operating division or Affiliated Company, such Member's benefit will be paid upon the Member's leaving the employment of such purchaser of such plant, operating division or Affiliated Company.**

same-desk employees from collecting their pensions upon leaving Burlington's employ.

Finally, the 1987 amendments modified a section that had previously permitted the trustee three ways to dispose of certain plan assets. Before the 1987 amendments, section 19.2 of article XIX permitted the Board to (1) distribute the benefits to certain employees within 60 days; (2) segregate these assets from the rest of the plan and transfer them to another separate fund; or (3) segregate the assets and transfer them to a separate retirement plan.[5]

> *Section 7.2*—A Member whose employment is terminated prior to his attaining age 55 due to lack of work, or due to the closing or sale of a plant or operating division, as determined by the Board, shall be entitled to receive 100% of the benefits described in Section 7.1 without regard to his vested percentage, **provided, however, in the case of a Member (1) whose employment is terminated because of the sale of a plant, operating division or Affiliated Company and (2) who within 90 days after such termination becomes employed by the purchaser or transferee of such plant, operating division or Affiliated Company, such Member's benefit will be paid upon the Member's leaving the employment of such purchaser of such plant, operating division or Affiliated Company....**
>
> *Section 11.3*—Unless a Member entitled to benefits elects by written request submitted to the Board that the payment of benefits hereunder commence at a later date, the payment of benefits shall commence not later than 60 days after the close of the Plan Year in which the Member's service with the Companies is terminated, **provided, however, in the case of a Member (1) whose employment is terminated because of the sale of a plant, operating division or Affiliated Company and (2) who within 90 days after such termination becomes employed by the purchaser or transferee of such plant, operating division or Affiliated Company, the term "Companies" (in this sentence only) shall be defined to include such purchaser of such plant, operating division or Affiliated Company.** If the amount of the payment required to commence on the date determined under this Section cannot be ascertained by such date, or if it is not possible to make such payment on such date because the Member cannot be located, a payment retroactive to such date shall be made no later than 60 days after the earliest date on which the amount of such payment can be determined or the date on which the Member is located....

Section 19.2 originally referred only to benefits payable under section 7.2 of article VII, a section that applied only to employees under age 55. The 1987 amendments, however, broadened the scope of section 19.2 to encompass the benefits payable to employees 55 and over.[6] In 1988, section 19.2 was further amended to allow the trustee to hold the assets without even segregating them. The 1988 amendments also stated that same-desk employees were not entitled to their retirement benefits until they left the employ of the successor company.[7]

5. *Section 19.2*—In the event any of the Companies shall cease to be a participant in the System, or in the event of a sale or disposition by a participating company of one or more of its divisions or principal operations to another person, firm, or corporation, the Trustee may, with the approval of the Board of Directors,
   (a) distribute the benefits applicable to the Member-employees of any such participating company, division, or operation, as provided in Section 7.2; or
   (b) segregate the assets of the System applicable to such employees and
   (i) hold such assets in a separate fund or trust for the benefit of such employees; or
   (ii) transfer such assets to any other qualified plan or trust in accordance with Section 19.1, provided that such other plan or trust is qualified under Section 401(a) or 501(a) of the Code....

6. The 1987 amendment is set forth in bolded and underlined type:
   *Section 19.2*—In the event any of the Companies shall cease to be a participant in the System, or in the event of a sale or disposition by a participating company of one or more of its divisions or principal operations to another person, firm, or corporation, the Trustee may, with the approval of the Board of Directors,
   (a) distribute the benefits applicable to the Member-employees of any such participating company, division, or operation, as provided in Sections **6.1,** 7.2**, and 11.3**; or
   (b) ...

7. Notwithstanding any provision of this System relating to vesting of Members' rights to benefits, in no event may distributions be made to any Member (1) whose employment is terminated because of the sale of a plant, operating division or Affiliated Company and (2) who within 90 days after such termination becomes employed by the purchaser or transferee of such plant, operating division or Affiliated Company, until such member leaves the employment of such purchaser of such plant, operating division or Affiliated Company.

The plaintiffs asked the Board for payment of their benefits after Burlington sold the plants or divisions for which the plaintiffs worked. The Board refused, stating it would pay benefits only after the plaintiffs left the employ of their successor companies. The plaintiffs thereupon filed this suit in 1989, claiming, among other things, that Burlington eliminated an accrued benefit when it amended the retirement plan to end the immediate payment of retirement benefits to same-desk employees.[8] After entertaining cross-motions for summary judgment and holding a hearing, the district court held that the 1987 amendments violated ERISA's "anti-cutback" rule, 29 U.S.C. § 1054(g), which prohibits the elimination of accrued benefits.

The district court stated that before the 1987 amendments, the plan did not give the Trustees the discretion to determine when and how to pay benefits to those 55 and over. Those 55 and over were entitled under the pre-amendment plan to full payment of benefits when their subsidiary was sold with their choice of how the benefits were to be paid. As for those under 55, the court concluded that before the amendments, Burlington could avoid immediate payment of benefits to same-desk employees only by acting in one of the two ways set forth in section 19.2: to segregate assets and hold them in a separate fund or trust, or to segregate the assets and transfer them to another qualified retirement plan. Because Burlington did neither, the court concluded that Burlington was obligated under the terms of the plan to disburse the benefits to those under 55 as well as those 55 and over.

## Discussion

ERISA's "anti-cutback" rule prohibits amendments to a retirement plan which diminish the accrued benefits of the participants.[9] The plaintiffs claim the 1987 amendments eliminated an accrued optional retirement benefit, namely, the right to receive a retirement benefit upon leaving Burlington's employ. See 26 C.F.R. § 1.411(d)–4 (defining optional form of benefit). Burlington claims that the 1987 and 1988 amendments could not have run afoul of the anti-cutback rule because regardless of their age, the plaintiffs never had an accrued right to receive immediate benefits upon leaving Burlington's employ. According to Burlington, it has always had the discretion to hold the same-desk employees' benefits in trust and pay these benefits later, such as when the employee stopped working for the new employer. Burlington argues that its interpretation of the plan's provisions was reasonable and that the District Court should have deferred to it.

When reviewing a denial of benefits under ERISA, a threshold question for reviewing courts is "whether the particular plan at issue vests in its administrators discretion either to settle disputed eligibility questions or to construe 'doubtful' provisions of the plan itself." De Nobel v. Vitro Corp., 885 F.2d 1180, 1186 (4th Cir.1989). If the plan grants fiduciaries the discretion to settle disputed eligibility questions or to construe "doubtful" provisions of the plan,

---

**8.** The plaintiffs' main claim is that they are entitled to immediate payment of their retirement benefits. They also point out that the segregation requirement in pre-amendment section 19.2 was advantageous to them. According to the plaintiffs, if their assets had been segregated, they would be assured of their pension no matter what happened to Burlington Industries and its retirement fund, and they would have benefitted from any gains resulting from the separate investment. We need not reach the issue of whether the segregation requirement amounted to an accrued benefit, however, in light of our decision to affirm the district court's judgment.

**9.** 29 U.S.C. § 1054(g)(1) provides as follows:

(1) the accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, ...

(2) For purposes of paragraph (1), a plan amendment which has the effect of—

(A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or

(B) eliminating an optional form of benefit, with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. In the case of a retirement-type subsidy the preceding sentence shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy.

"a reviewing court may disturb the challenged denial of benefits only upon a showing of procedural or substantive abuse." *Id.* If the plan does not contain such language, however, a denial of benefits challenged under ERISA must be reviewed under a *de novo* standard, without deference to the parties' interpretations of the plan. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 112, 115, 109 S.Ct. 948, 954, 956, 103 L.Ed.2d 80 (1989).

■ The parties do not dispute that the plan gives the Board the discretion either to settle disputed eligibility questions or to construe doubtful provisions of the plan itself.[10] Rather, the dispute centers on whether the pre-amendment plan language regarding same-desk employees was "doubtful" or "unclear." If the language is unclear, we must defer to a reasonable interpretation of the plan by the Board. If the plan language is unambiguous, however, we would not defer to a contrary interpretation by the Board. *Id.* at 1188 (abuse of discretion may be found where fiduciaries' interpretation is "contrary to the clear language of the plan"). After examining the plan documents, we conclude, as did the district court, that the pre-amendment plan clearly required the Board to pay retirement benefits to the plaintiffs when they left Burlington's employ, and that the Board's contrary interpretation is not entitled to deference.

It is undisputed that the plaintiffs' retirement benefits are vested. *See supra* notes 1 and 2 (setting forth articles VI and VII of the plan). It is also undisputed that plan members can choose how their retirement benefits are to be paid, including a lump sum option. The dispute centers on when payment is due. We believe this question ultimately is controlled by article XI of the plan, entitled "Payment of Benefits."

Before the 1987 amendments, section 11.3 of article XI stated that a plan member entitled to benefits would be paid within 60 days of the end of the plan year in which the member's service with the company was terminated, with payment to be delayed only *at the discretion of the plan member.* The section gave the Board discretion to delay payments in only one case: if the member could not be located. Even then, the plan tightly circumscribed the Board's discretion to delay payment: once the member was located, the plan required the Board to pay the member's benefits retroactive to a date 60 days after the end of the plan year in which the member retired. Nowhere did pre-amendment section 11.3 state that the 60-day payout rule was inapplicable to same-desk employees.[11]

This is in contrast to the cases cited by Burlington where the plans explicitly granted the fiduciary the discretion to determine the method and timing of early retirement benefit payments. *See, e.g., Morse v. Stanley,* 732 F.2d 1139, 1142 (2d Cir.1984) (plaintiffs not entitled to particular benefit when plan clearly provided that the method and time of payment was in the trustees' sole discretion); *Fine v. Semet,* 699 F.2d 1091, 1093 (11th Cir.1983) (plaintiffs not entitled to early retirement benefits where advisory committee had sole discretion to direct trustee to pay such benefits). In such cases, of course, the timing of a lump-sum benefit would be a discretionary rather than an accrued benefit, and elimination of such a discretionary benefit generally would be permissible under ERISA.

Here, however, article XI mandated that the Board pay benefits to a member within 60 days of the end of the year in which a member's service with the company was terminated. Although a member could choose the form of the benefits (lump sum, annuity, etc.) and could choose to delay

---

**10.** Section 15.3 of the plan gives the Board "the exclusive right to interpret the System and to decide any and all matters arising thereunder."

**11.** Burlington's past practice is consistent with the plain language of the plan. *De Nobel,* 885 F.2d at 1188 (court must give due consideration to whether provisions at issue have been applied

consistently). The record indicates that Burlington had sold divisions or plants before 1987, and the executive director of the Board of Administration could not recall a single instance before 1987 in which the Board failed to pay benefits to same-desk employees at the time of sale.

receipt of benefits, the Board did not possess such discretion. Moreover, pre-amendment section 18.1 provided that "no amendment shall eliminate the option provided in Subsection 6.3(a) to receive a lump sum payment with respect to benefits attributable to service before the amendment."

Burlington acknowledges the payment schedule set forth in article XI, but claims that a different provision (article XIX, entitled "Merger, Consolidation, or Successor Employer") still gave the Board the discretion to delay payments to all same-desk employees even before the 1987 amendments. As the district court found, preamendment section 19.2, upon which Burlington relies, does grant the Board some discretion to delay payment to same-desk employees under 55. Like the district court, however, we conclude that the discretion that section granted the Board was far more limited than the broad discretion claimed by Burlington and that the Board's actions exceeded that limited grant of discretion.

Section 19.2 applied by its terms only to employees 55 and under. Significantly, the pre–1987 version of section 19.2 referred only to distributing the benefits provided in section 7.2. *See supra* note 5. Section 7.2, in turn, was a specific provision dealing with benefits for same-desk employees under 55. *See supra* note 2. If, as Burlington claims, section 19.2 had always applied to all same-desk employees regardless of age, Burlington would not have needed to refer to section 7.2 in pre-amendment section 19.2, and would not have had to amend section 19.2 in 1987 to include section 6.1, the section governing benefits applicable to members 55 or over. *See supra* note 6.

Perhaps recognizing this, Burlington claims it amended section 19.2 in 1987 merely to conform with regulations the Internal Revenue Service proposed in 1986. Burlington contends that the proposed regulations required it to either (a) eliminate the Board's discretion to pay lump sums to same-desk employees, or (b) make such lump-sum payments mandatory. For several reasons, we agree with the district

court that this contention is without merit. First, the 1986 regulations were only a proposal. They did not come into effect until 1988, so Burlington was under no obligation to follow them in 1987. More importantly, the 1987 amendment to section 19.2 could not have achieved its purported intent: to reduce the Board's discretion. Any discretion that the Board possessed prior to the amendments remained after the 1987 amendments. In fact, the amendments increased the Board's discretion with respect to lump-sum payments by expanding the scope of section 19.2 to include amended sections 6.1 and 11.3, which now incorporated same-desk employees. *See supra* notes 4 and 6.

Because section 19.2 does not apply to same-desk employees 55 and over, the provision regarding the timing of payment of benefits (section 11.3) necessarily controls when those employees will receive their retirement benefits. As noted above, section 11.3 requires the Board to pay benefits to a member within 60 days of the end of the year in which that member left Burlington's employ. Thus, we agree with the district court that the unamended plan entitled same-desk employees 55 or over to payment of benefits upon separation from Burlington and that the 1987 amendments unlawfully deferred this accrued right.

The same is true for same-desk employees under age 55. Preamendment section 19.2 applies to that class of employees, and allowed the trustees to do only three things if Burlington sold a division: (1) distribute the benefits to the same-desk members under 55, or (2) segregate those members' assets and hold them in a separate fund, or (3) segregate those members' assets and transfer them to another qualified fund. *See supra* note 5. The section did not empower the Board to do anything else.

After selling the division for which the plaintiffs worked, however, the Board took none of the three actions enumerated in section 19.2. Instead, the Board has held the plaintiffs' assets and commingled them with other plan assets, an option not granted under section 19.2 until after the 1988 amendments.

Thus, as the district court found, the Board could avoid disbursing funds to same-desk employees under 55 only by complying with the segregation procedures set forth in section 19.2. Because the Board did not take these specific actions, the employees' rights and the Board's obligations under sections 7.2 and 11.3 remained in effect. These provisions required the Board to pay the under 55 plaintiffs within 60 days after the end of the plan year in which they left Burlington's employ. *See supra* notes 2 and 3.

The district court's grant of summary judgment was proper, and we therefore affirm.

AFFIRMED.