**John S. MORSE, Plaintiff-Appellant,**

v.

**Edmund A. STANLEY, Jr., Victor Simonte, Jr., Franz Von Ziegesar and Carl R. Pite, et al., Defendants-Appellees.**

**Michael Don ROMACHO,
Plaintiff-Appellant,**

v.

**Edmund A. STANLEY, Jr., Victor Simonte, Jr., Franz Von Ziegesar and Carl R. Pite, et al., Defendants-Appellees.**

**Robert D. COHEN, Plaintiff-Appellee,**

v.

**Edmund A. STANLEY, Jr., Victor Simonte, Jr., Franz Von Ziegesar and Carl R. Pite, et al., Defendants-Appellants.**

**Nos. 618–620, Dockets 83–7615,
83–7716 and 83–7823.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 12, 1984.

Decided April 23, 1984.

Thomas F. Curnin, New York City (Kenneth E. Meister, Cahill, Gordon & Reindel, New York City, of counsel), for plaintiff-appellant Morse.

Loretta A. Preska, Hertzog, Calamari & Gleason, New York City, for plaintiff-appellant Romacho and plaintiff-appellee Cohen.

John W. Ohlweiler, New York City (Gary I. Horowitz, Simpson, Thacher & Bartlett, New York City, of counsel), for defendants-appellants-appellees Stanley, et al.

Before KAUFMAN, OAKES and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge.

The trustees of a company's profit sharing plan voted to deny three departing employees' requests for accelerated payment of their vested benefits under the Plan upon their departure to work for a competitor. Each brought suit and for some inexplicable reason and despite the fact that two of the employees had the same counsel, each case was tried separately before a different district court judge. Two of the trial courts sustained the Trustees' denial of accelerated benefits, and the third found that decision of the Trustees to be arbitrary and capricious. Because these varying results may not be justified on any differences found in the records, we undertake a full review of all three cases, which have been consolidated for purposes of appeal.

The central question in each case is whether the Trustees violated their fiduciary obligations under ERISA. To resolve this issue requires an examination of the scope of discretion afforded ERISA trustees. Discretion spans the legal terrain—like a rainbow arcing overhead—and is a multi-faceted concept whose contours are just as undefined as the reflection of the sun's rays in the mist. Despite its elusiveness, we must—as these appeals illustrate—focus narrowly on the discretion exercised on the facts in this case and define the guides that measure it.

## I FACTS

Bowne of New York, Inc. (Bowne) is a New York corporation engaged primarily in the financial and corporate printing business. Its headquarters are located in New York City with subsidiaries scattered throughout the United States. Plaintiffs, John S. Morse, Michael Don Romacho, and Robert D. Cohen were employed by Bowne until each voluntarily resigned in order to work for Pandick Press, Inc., (Pandick), also of New York City. Pandick also has subsidiaries in other United States cities. Pandick is engaged in corporate and financial printing and is a direct competitor of Bowne. Ironically, Bowne and Pandick have their principal offices in the same building in New York.

Morse was the first to leave Bowne to accept a position with Pandick. He had worked at Bowne for 16 years and had become a highly successful salesman for the company. When Morse left in June 1980, he was Bowne's highest paid employee and he took a substantial part of his business, valued at over two million dollars annually, with him to Pandick. The circumstances surrounding his departure included the familiar ones of his unhappiness with the compensation arrangement and his belief that Bowne was not properly responsive to the needs of his accounts. At Morse's urging, Plaintiff Michael Don Romacho also left Bowne later in June to accept employment at Pandick. Since Romacho had worked closely with Morse, he was intimately familiar with the specific peculiarities and needs of Morse's accounts. In addition to Romacho, Morse later recruited plaintiff Robert D. Cohen to work at Pandick. At Bowne, Cohen had worked as a pricing analyst, a back-office position requiring little client contact. Cohen resigned his position with Bowne on March 17, 1981.

Bowne established a Deferred Profit Sharing Plan for its employees in 1961. The Plan, to which the employees make no contribution, has been amended several times over the years. Originally, it contained a provision that an employee who left to work for a competitor would forfeit his entire accrued interest. This clause was deleted in 1977 when the Plan was recast to bring it into compliance with ERISA. *See generally* Lawson & Watson, *Forfeiture-for-Cause "Bad Boy" Clauses: Is There Any Life Left After ERISA?— Confusion in the Arena,* 60 Taxes 827 (1982). A summary booklet entitled "Highlights of the Bowne Profit Sharing Plan for Employees of Participating Companies of Bowne & Co., Inc." was distributed to all Plan participants. It described the provisions for the payment of benefits, noting specifically the general rule that a participant shall be entitled to the balance in his

account upon his retirement. The booklet is short; it is easy to read and understand. Normal, Post-Normal and Early Retirement are all described. Normal retirement is when a participant reaches his 65th birthday, at which time he is entitled to the balance of his account in a lump sum, one of several annuity options, or a combination of the two. The method of payment is selected by the participant with the Trustees' approval. Post-normal retirement applies to an employee who continues employment with Bowne beyond his 65th birthday. Such an employee continues to participate in the Plan until he retires, at which time he receives the balance of his account as just described. Early Retirement, with which we are concerned in all three cases, is described and illustrated by means of a vesting chart, and applies to those employees who leave or are discharged before normal retirement, i.e., age 65, leaving aside employees who depart on account of death or disability. Early retirees cease to be participants. Such a retiree's account vests to the extent of 10% for each full year of employment (beginning with the third year) and the account is 100% vested upon completion of 12 years of credited service with Bowne. Where an employee retires early, or otherwise leaves the employ of the company, the summary states that the participant is entitled to receive payment for his vested interest. In this circumstance, the Plan clearly provides that "[t]he method and time of making payment shall be determined by the Trustees in their sole discretion."

Between the time that the Plan was amended and restated in 1977 to comply with ERISA and the time that these employees sought distribution under it, every participant who left the employ of Bowne and requested accelerated payment of the vested amount in his plan account received that amount in full. During the period 1977 through 1980, 79 Plan participants who left Bowne prior to their early or normal retirement dates were granted accelerated distributions. The amounts of these payments ranged from $45.92 to $70,236.83. These employees, according to the Trustees, either had less than $10,000 in their accounts or did not leave to join a competitor.

Of the 79 employees who left after the Plan was restated in 1977, there were four employees who plaintiffs argued left to join a competitor. Two of them had less than $10,000 in their accounts, and Lang, one of the remaining two departing employees, went to work for a company that had just opened a New York City office. Since Lang had been terminated by Bowne, the Trustees considered this factor when they decided to accelerate his payments. Anderer, the other departing employee, went to work for a South Carolina commercial printer that did not compete with Bowne.

After Morse, Romacho and Cohen resigned from Bowne, each requested that the Trustees of the Profit Sharing Plan grant them accelerated distribution of their vested profit sharing benefits. The Trustees denied these requests, relying on their policy not to grant accelerated distributions to employees who went to work for competitors in cases where the amount of the vested benefits exceeded $10,000. Under the Plan, plaintiffs Morse and Romacho had a vested interest in 100% of their accounts and plaintiff Cohen had a 50% vested interest in his account based upon seven years service. The amount of their vested interest in each of their accounts was $203,778.00, $47,481.59 and $13,759.23 respectively. The plaintiffs then challenged the Trustees' decisions separately in the district courts, claiming in effect that they were the first to be denied accelerated distributions and that the Trustees' failure to disclose their non-acceleration policy constituted a violation of ERISA, as well as a breach of their fiduciary duty to administer the Plan solely in the interest of its participants.

The district court judges, as noted, responded to these claims differently. In the first decision to be handed down, Judge Edelstein held that Cohen was entitled to his vested benefits, ruling that the Trustees' decision was arbitrary and capricious, and that the Trustees' "treatment of Cohen

in departing from a consistently applied practice was improper as it was not done solely in the interests of the Plan participants." *Cohen v. Stanley*, 566 F.Supp. 246, 254 (S.D.N.Y.1983). In *Morse v. Stanley*, 566 F.Supp. 1455 (S.D.N.Y.1983), Judge Owen next ruled in favor of the Trustees, finding that the "defendants, as trustees of the Trust, implemented a *policy* of paying accelerated benefits only to terminated plan participants who either left Bowne to take employment with companies which did not directly compete with Bowne or whose vested benefits were not greatly in excess of $10,000." *Id.* at 1456 (emphasis added). Although Judge Owen found that the policy enlarged rather than restricted participants' rights and worked no prejudice to Morse, he ordered the defendants to distribute to their employees and file with the Secretary of Labor a summary of these modifications, based upon his conclusion that the Trustees had not met their responsibility of furnishing the Plan participants with a summary description of material changes in coverage. *Id.* at 1459. Finally, in *Romacho v. Stanley*, 567 F.Supp. 1417 (S.D.N.Y.1983), Judge Weinfeld, cognizant of these two earlier decisions, sided with the Trustees and found their determination "was rationally made and in good faith." *Id.* at 1419. He concluded that discretion exercised favorably in the past constituted no waiver for present cases where in the Trustees' judgment accelerated distribution would be detrimental to the Plan. *Id.* at 1421. The court credited the testimony of the Trustees and concluded that their policy of denying such benefits was effected to discourage competitive raiding and to encourage employees to stay at Bowne. The court also held that no violation of ERISA resulted from the Trustees' failure to disclose in advance their policy with respect to accelerated distributions, and concluded that Romacho's knowledge of the Trustees' discretionary power to grant early payment was all that was required under ERISA. *See id.* at 1423–25.

On their appeals, Morse, Romacho and Cohen reiterate the same arguments they made at their earlier trials: first, that the Trustees acted arbitrarily and capriciously in denying them accelerated distribution of their vested profit sharing benefits, second, that the Trustees breached their fiduciary duty to administer the plan solely in the interest of its participants and, third, that the Trustees' failure to disclose their policy regarding accelerated distributions violated ERISA.

## II  SCOPE OF REVIEW

Before entering upon an analysis of these claims, it is plain that since there is a division between three district courts, a full and thorough review is necessary on this appeal. Even in the ordinary case, however, trial court review in the first instance of an ERISA trustee's exercise of discretion will not relegate an appellate court's function to perfunctorily rubber stamping its imprimatur on a district court's determination. Where Congress makes a declaration of a national policy, as it has in ERISA, we view it as part of an appellate court's function to ensure a consistent and principled application of a fiduciary's obligations under that statute. *See* Friendly, *Indiscretion about Discretion*, 31 Emory L.J. 747, 783–84 (1982), particularly "bearing in mind the special nature and purpose of employee benefit plans." H.Conf.Rep. No. 1280, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 *U.S.Code Cong. & Ad.News*, 4639, 5038, 5083. With that function in mind, we next consider plaintiffs' claims in order.

## III  DISCUSSION

### A.  *Claim of Arbitrary Denial*

A review of the Plan itself reveals that Trustees are not required to make accelerated distributions to employees who leave the company to work elsewhere. Article 8.1(A) of the Plan entitles a participant normally to begin receiving distributions at the *later* of (1) his normal or early retirement date or (2) the date he terminates employment with the company. Article 8.1(B) states that the Trustees may establish procedures to make distributions to a

Terminated Participant at an earlier date. Further, Article 12.5 of the plan provides specifically that

> The Trustees shall have the right and authority to construe and interpret the provisions of this agreement, and they may resolve any ambiguity, supply any omission and resolve any inconsistency in such manner as they deem fair and proper .... *Any decision or act made or done by the Trustees pursuant to any provision of the Plan shall be in their sole and absolute discretion.* (emphasis added)

Plaintiffs maintain that the Trustees had by their prior conduct established a practice of making distributions to all terminated Plan participants without regard either to the amount of the participant's account balance or the nature of his subsequent employment. From this, they argue that the Trustees should not now be permitted to reverse such practice and single them out for dissimilar treatment. This argument misses the mark for several reasons. Whether the Trustees had in the past granted acceleration to employees who requested it does not mean that they had donned a discretionary strait-jacket which held them bound to grant acceleration in all cases as a matter of course. On the contrary, the Plan gave them broad discretion to evaluate requests for accelerated distribution on a case by case basis.

■ Again, the evidence at the trials reveals that the Trustees have subsequently applied their policy of not granting accelerated distributions to those employees who had over $10,000 in vested benefits in their accounts and left Bowne to accept employment with companies found by the Trustees to be direct competitors. The expressed rationale is to encourage Bowne's employees to remain with Bowne, rather than accept competitive employment and obtain a cash windfall in the form of a lump-sum award from the Bowne Plan. To accept plaintiffs' view of how the Plan should be administered would, in the felicitous words of Judge Owen, "change the Bowne plan from a retirement security pro-

gram into a departure incentive plan." *Morse, supra,* 566 F.Supp. at 1459. Considering that one of the purposes of a profit sharing plan is to provide financial resources to an employee at the time he retires and that the plaintiffs in this case will each receive their vested benefits with interest upon reaching their normal retirement age (65), their contention that the Trustees acted arbitrarily or in bad faith in denying them accelerated distributions is without merit. *See Pompano v. Michael Schiavone & Sons, Inc.,* 680 F.2d 911, 915 (2d Cir.), *cert. denied,* 459 U.S. 1039, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982); *see also Fine v. Semet,* 699 F.2d 1091 (11th Cir. 1983).

**B.** *Claim of Breach of Fiduciary Duty to Administer a Plan Solely in Interest of its Participants*

Plaintiffs next argue that the trustees breached their fiduciary duty to administer the plan "solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of ... providing benefits to participants" as required under Section 404(a)(1)(A)(i) of ERISA, 29 U.S.C. § 1104(a)(1)(A)(i) (1982). Relying on *Frary v. Shorr Paper Products, Inc.,* 494 F.Supp. 565 (N.D.Ill.1980), plaintiffs maintain that the Trustees were acting in Bowne's interests, and not in the interest of the Plan participants when they denied their applications for accelerated distributions. The Trustees on the other hand claim that the denial of these accelerated distributions was in the best interest of the trust and its participants and beneficiaries. In arguing that the loss of employees leads to the loss of profits, the Trustees maintain that they intended to ensure the profitability of the trust by denying these particular requests for accelerated distributions.

■ To give full consideration to plaintiffs' argument it is necessary to explore the framework within which ERISA trustees are required to function. In addition to requiring that a fiduciary administer a plan solely in the interest of the participants and beneficiaries, Congress provided

that a trustee shall discharge his duties with respect to the plan with the care, skill, prudence and diligence that a prudent man would use. *See* 29 U.S.C. § 1104(a)(1)(B) (1982). This charge imposes an unwavering duty on an ERISA trustee to make decisions with single-minded devotion to a plan's participants and beneficiaries and, in so doing, to act as a prudent person would act in a similar situation. These familiar principles evolved from the common law of trusts that Congress codified and made applicable to ERISA trustees. *See* H.R.Rep. No. 533, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 *U.S.Code Cong. & Ad. News*, 4639, 4649; S.Rep. No. 127, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 *U.S.Code Cong. & Ad.News*, 4838, 4864–65. *See also* Kroll & Tauber, *Fiduciary Responsibility Under ERISA*, 35 N.Y.U. Inst. on Fed. Tax'n. 1059 (1977); Little & Thrailkill, *Fiduciaries Under ERISA: A Narrow Path to Tread*, 30 Vand.L.Rev. 1 (1977). It is therefore helpful in defining a trustee's duties to have in mind these common law concepts.

■ The general rules which bear on the Trustees' acts here include a strict standard of conduct, a duty to exercise such care and skill as a person of ordinary prudence would exercise in dealing with his own property and, bearing in mind the special nature and purpose of an employee profit sharing plan, to use care and skill to preserve the trust corpus. *See* II A. Scott, *The Law of Trusts*, §§ 170.25, 174, 176 (3d ed. 1967); *Restatement (Second) of Trusts* §§ 169, 170, 174, 176 (1959). More specifically, for our purposes a trustee has a duty to deal impartially with beneficiaries. In this case there are working Plan participants and retired beneficiaries and/or their families. The trustee must deal even-handedly among them, doing his best for the entire trust looked at as a whole. *See* II A. Scott, *The Law of Trusts*, § 183 at 1473; *Restatement (Second) of Trusts* § 183; Note, *The Duties of Employee Benefit Plan Trustees Under ERISA in Hostile Tender Offers*, 82 Colum.L.Rev. 1692, 1706–07 (1982). That is to say, a trustee's duty is not to prefer the present interest of one group, *e.g.*, here the departing plan participants, but also not to unduly delay payment of benefits to such participants to their detriment. This is a salutary rule because at the slightest suggestion that any action taken was with other than the beneficiaries in mind, a trustee is subject to liability for resulting injury that the beneficiaries may suffer. *See* 29 U.S.C. § 1109(a) (1982); *NLRB v. Amax Coal Co.*, 453 U.S. 322, 331–34, 101 S.Ct. 2789, 2795–97, 69 L.Ed.2d 672 (1981).

Further, Congress in its findings and declaration of policy sought to assure the equitable character and financial soundness of trustee benefit plans. For that reason it established "standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and [provided] for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b) (1982). Having charged trustees with the duty to implement this national policy, it follows that the equitable powers which a trustee exercises are fettered with meaningful standards, implicit in the reference to "remedies, sanctions, and ready access to the Federal courts." *Id.*

■ Thus, a court may intervene in the administration of an employee benefit plan, but should intervene only when the trustees transgress their fiduciary duties by acting in an arbitrary and capricious manner. *Paris v. Profit Sharing Plan*, 637 F.2d 357, 362 (5th Cir.), *cert. denied*, 454 U.S. 836, 102 S.Ct. 140, 70 L.Ed.2d 117 (1981); *Kosty v. Lewis*, 319 F.2d 744 (D.C. Cir.1963), *cert. denied*, 375 U.S. 964, 84 S.Ct. 482, 11 L.Ed.2d 414 (1964). This standard strikes a balance between excessive judicial intervention in the discharge of trustees' duties, on the one hand, and abdication of traditional judicial control of fiduciaries' actions, on the other. *See Rehmar v. Smith*, 555 F.2d 1362, 1371 (9th Cir. 1976).

■ The question then is whether the Trustees' conduct here in denying plaintiffs' requests for accelerated payments was a breach of their fiduciary responsibili-

ty to administer this Plan solely in the interests of its participants. In this case the answer must be "no." Since the Plan is a profit sharing plan funded under Article 3.1 entirely by employer contributions, the amount of funding depends upon the amount of profits generated by the business. One of the important components of profitability, of course, is the productivity of the employees in the business. Where an employee leaves a company to accept a position *outside* the industry, that company's profits are affected by the costs it must incur to groom a replacement; but if that same employee accepts a position within the *same* industry and with a direct competitor, not only must the first company bear the costs of grooming a replacement, but it suffers additional detriment from the competitor's use of that employee's talents and contacts. This is especially so here, where profitable accounts were actually transferred to a competitor. Hence, since an exodus of key Bowne employees plainly reduces the growth and fiscal strength of the Plan, the Trustees' decision to deny accelerated benefits to the employees here could scarcely be viewed as a breach of their duty to administer the Plan in the sole interest of all its participants.

Further, the Trustees' implementation of such a policy in this case served to apprise Bowne employees that they would not be rewarded with accelerated distributions if they decided to leave in order to work for a competitor. Such a policy strikes us as fulfilling a duty of acting with the skill of "a prudent man acting in a like capacity and familiar with such matters ...." 29 U.S.C. § 1104(a)(1)(B) (1982). Certainly, a refusal to adopt a policy to accelerate benefits simply on demand, when such is not called for under the terms of the Plan, must be characterized as an effort to preserve the trust corpus. In considering whether the Trustees discharged their duty to deal impartially with the interests of all participants, it is significant that all of these plaintiffs *voluntarily* left Bowne in search of better opportunity at Pandick. Despite the invitation of the Trustees, none

of them made any showing that they would face financial hardship in the absence of a lump sum distribution from the Bowne Plan. When weighing their interests against those participants who continued on as Bowne employees, it is clear that to award those departing employees with a financial windfall would in fact have preferred them at the expense of the entire trust.

Nor do we view with a jaundiced eye the fact that the Plan Trustees were also members of Bowne's senior management. Officers of a corporation often are trustees of its benefit plan. It is no violation of a trustee's fiduciary duties to take a course of action which reasonably best promotes the interest of plan participants simply because it incidentally also benefits the corporation. *Cf. Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir.), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). Here the refusal to grant acceleration was followed by the Trustees as a matter of policy in order to maintain the fiscal integrity of the Plan. The consistency of its application supports their assertion of impartiality. The fact that this policy benefited the company is not in these circumstances the kind of action which raises doubt as to the Trustees' total loyalty to *all* plan participants. *See generally* G. Morales, *Employee Benefit Plans: Discretion of Trustees to Grant or Deny Applications for Benefits*, 29 Lab.L.J. 726 (1978).

Moreover, plaintiffs' reliance on *Frary v. Shorr Paper Products Inc.*, *supra*, is not well placed. There the trustees failed to offer "*any* justification for their policy which serves an interest of the Plan's participants" and also admitted that their policy was "designed to punish employees who assume employment with a competitor and thereby breach their employment agreements." 494 F.Supp. at 569 (emphasis in original). Aside from the fact that plaintiffs here were not subject to any employment contracts containing non-competition provisions, the Trustees in this case *have* come forward and fully justified their deci-

sion to deny accelerated distribution. All in all, we conclude that they fully discharged their fiduciary obligations under 29 U.S.C. § 1104.

### C. Claim that the Plan Violated ERISA's Disclosure Requirements

Finally, plaintiffs urge that the trustees violated their fiduciary duties under 29 U.S.C. § 1021(a) by failing to disclose specifically their policy of denying acceleration within either the Plan itself or the written instruments generally available to participants for examination. In claiming that the summary plan description failed to comply with ERISA's disclosure requirements, plaintiffs conclude that the Trustees should be estopped from applying their policy to them.

Section 102(a)(1) of ERISA, 29 U.S.C. § 1022(a)(1) (1982), states in substance that a summary plan description be furnished to plan participants and beneficiaries and that it be written in a manner calculated to be understood by the average plan participant. Inasmuch as the statute requires that the plan description "be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations" under it, the regulations promulgated by the Department of Labor further focus upon these requirements by noting that the summary plan description "must not have the effect [of] misleading, misinforming or failing to inform participants and beneficiaries." 29 C.F.R. § 2520.102–2(b) (1983). The same regulations also provide that any limitation on plan benefits shall not be "otherwise made to appear unimportant," *id.*, and that the plan description have "a statement clearly identifying circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture or suspension of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide ...." 29 C.F.R. § 2520.-102–3(*l*) (1983). Plaintiffs rely on these regulations as supporting their position that the Bowne Plan description was misleading insofar as it did not spell out the Trustees' non-acceleration policy and cite the same regulations as the basis for their claim that the Trustees were required under ERISA to disclose in writing the details of that policy. Notably, no claim is made that the Plan summary was written in technical jargon or in other than plain, easy to understand English.

In *Pompano v. Michael Schiavone & Sons, Inc., supra,* we sustained the discretion of a pension committee to refuse to award a lump sum payment to a participant where the terms of that plan gave the committee discretion over the mode of payment. Plaintiff there argued that the plan, which stated merely that the lump sum option was available only with the approval of the pension committee, should have spelled out the factors to be considered by the committee in making its determination. Observing that the legislative history made plain that the focus of Congress' concern was with circumstances that caused a participant or beneficiary *not* to receive benefits, we concluded that any further specificity would "undercut the flexibility essential to effective and responsible financial management of the plan which Congress intended when it adopted for ERISA fiduciaries the 'prudent man' standard." 680 F.2d at 914.

As in *Pompano*, here there is no denial of benefits required under the Plan to any of these plaintiffs, and they ultimately will receive *all* of their benefits, with interest, upon reaching age 65. Under the Plan's terms, payment of benefits is *mandated* only upon participant's reaching his normal or early retirement date or on account of his death or disability. Payment of benefits under other circumstances is expressly left to the Trustees' *sole discretion.* Were we to require the Trustees to spell out those circumstances in which accelerated distribution would be granted or denied, we would read out of the Plan the discretionary powers expressly granted to the Trustees to act as varying circumstances arise. For this reason, we do not adopt the view of the district court in *Morse* which required the Trustees to put their policy in writing, for such would almost certainly undercut the flexibility essential to effective plan management.

**1148**

■ In addition, the evidence at the trials reveals that the Trustees originally attempted to enumerate certain factors that they intended to utilize in exercising their discretion, but abandoned that effort based on their belief that such a laundry list might foreclose the fair disposition of individual cases falling outside of its scope. The Trustees "wanted to be free to consider a host of relevant factors in addition to competitive activity and size of account balance, such as whether the former employee or a member of his family was ill or facing some financial hardship, and considered that drawing up an exhaustive list might foreclose consideration of worthy and compelling individual cases." *Romacho, supra,* 567 F.Supp. at 1425. Hence, the existing Plan description was sufficiently accurate and comprehensive to give fair notice to the participants and beneficiaries of their rights under it and the fact that the non-acceleration policy was not spelled out in the summary or the Plan did not violate ERISA's disclosure requirements.

## IV  CONCLUSION

In accordance with this opinion, the judgment of the district court in *Romacho v. Stanley* is affirmed, the judgment of the district court in *Morse v. Stanley,* except to the extent noted in III C., is affirmed, and the judgment of the district court in *Cohen v. Stanley* is reversed and the complaint dismissed.

OAKES, Circuit Judge (dissenting).

I dissent.

A "policy" intended to deter employees from seeking employment with others but not announced to those employees is not a policy. All three district judges found this "policy" undisclosed. To invent such a "policy" after the fact to punish the former employees who found employment with competitors is, in my view, arbitrary and capricious. The failure to disclose it shows that it was just such an invention. To condone such an invention in the name of discretion is to open the door to other unannounced "policies" that adversely affect employees whom Congress intended to protect by the disclosure provisions of ERISA, 29 U.S.C. § 1022(a)(1) (1982).

Profit-sharing plans are to encourage employees to come and to remain with an employer in lieu of some other form of compensation; they are deferred benefits, with tax advantages, and are distinct from pension plans which are designed to provide retirement benefits, a distinction which the majority opinion glosses over. Nor does this "policy" work to protect the trust corpus as the majority suggests; employees who do not go with competitors get their vested benefit on an accelerated basis; even the vested benefits of the employees here are required to be placed in segregated bank accounts. What happens is simply that employees who go with competitors do not have the use of the money in the meanwhile. And for the majority to say (at page 1146) that "[t]he consistency of [the] application [of the policy to refuse to grant acceleration] supports [the trustees'] assertion of impartiality" is simply a bit of judicial magic; the empty hat we were shown always had a rabbit in it.