Antonio J. CRISCENTI, Barry A. Eccher, Robert R. Ellis, and Roger W. PRYOR, Plaintiffs,

v.

**BRADCO PROFIT CENTERS' EMPLOYEES PROFIT SHARING INVESTMENT PLAN, Tenant Development, Inc., Integrated Coating and Flooring, Systems, Inc., Conco Services, Ltd., Bradco International, Ltd. Employees Profit Sharing Investment Plan, Bradco International, Ltd., Ellis Smith, as Administrator of the Bradco Profit Centers' Employees Profit Sharing Investment Plan and Bradco International, Ltd., Employees Profit Sharing Investment Plan, and San Diego Trust and Savings Bank, as Trustee of the Bradco Profit Centers' Employees Profit Investment Plan and Bradco International, Ltd. Employees Profit Sharing Investment Plan, Defendants.**

Civ. No. 87–1247–T.

United States District Court,
S.D. California.

Nov. 8, 1988.

Robert J. Hanna, Hillyer & Irwin, San Diego, for plaintiffs.

Charles H. Dick, Jr., MacDonald, Halsted & Laybourne, San Diego, for defendants.

## MEMORANDUM OF DECISION

TURRENTINE, Senior District Judge.

The administrator of a non-contributory employee profit sharing plan denied a request by four employees, who voluntarily left their employment to form a competitive enterprise, that they be paid their profit sharing benefits in a lump sum. Instead, the administrator, in the exercise of his discretion, determined that the former employees should be paid on an installment basis. Plaintiffs/former employees brought this action, alleging that the plan administrator acted arbitrarily, capriciously, in bad faith, and contrary to law, and breached his fiduciary duties, seeking a declaration that they be paid their accrued benefits in a lump sum.

## I. FACTS

E.F. Brady incorporated his small, San Diego-based construction company into E.F. Brady Co. (hereinafter "the company") in 1956. Capitalizing on the post-war construction boom in California, Mr. Brady's firm grew into a good sized company by the mid-sixties, seasonally employing 40 to 100 laborers. In a clearly stated effort to attract and retain the best employees available, and *to provide his employees with retirement benefits,* a virtual unknown in the construction industry, Mr. Brady inaugurated the E.F. Brady Co. Profit Sharing Plan (the "Plan")[1] in 1961. Under the terms of the Plan, the company contributed a share of its profits to the Plan each year, to be invested on behalf of the Plan participants. The Plan administration committee, the so-called "Grand Committee," was replaced by a sole administrator, co-defendant Ellis Smith ("Smith"), with the passage of the Employee Retirement Income Security Act of 1974 ("ERISA"). Since 1974, and to the present, Smith, exclusively, has handled the management of the Plan, and the payouts made thereunder.

The Plan provides that, upon separation from the company, whether via retirement, termination, injury or for other reason, the separating employee would be paid his *vested* benefits in one of three forms: (1) a lump sum payment; (2) an annuity; or (3) through 10 equal, annual installments ("the ten payment plan"). Sole discretion as to the method of payment is vested in the Plan administrator, first the Grand Committee, and, presently, Smith.

Mr. Brady, and his sons Ron and Robert, served as members of the Grand Committee, as did plaintiffs Eccher and Criscenti. In addition, plaintiff Ellis attended several Grand Committee meetings, including some meetings in which the issues underlying this action were discussed, as will be later developed.

As the president of the company, and as a member of the Grand Committee, Mr. Brady enunciated two basic and fundamental convictions regarding the Plan: (1) the Plan was intended as a *retirement* benefit; and (2) employees who left the company to enter *direct* competition should not receive lump sum distributions to fund their competitive efforts.

During the tenure of the Grand Committee, four employees were paid their bene-

---

1. "The company" refers to all of the defendants herein, except for co-defendant Ellis Smith, acting in his individual capacity as Plan Administrator. The company maintains four virtually identical profit sharing plans, two of which are named as defendants in this action. For purposes of clarity and simplicity, the defendant plans are referred to as "the Plan."

fits via either the ten payment plan or the annuity program. The overwhelming majority of the separating employees, during both the Grand Committee and Smith administrations, were paid lump sums. Not coincidentally, the overwhelming majority of the payouts made to employees who left the company to go into some sort of competition, be it working for themselves or for another, were in fairly minimal sums, in most cases less than $5,000. In fact, the plaintiffs did not, and the court must assume could not, produce a single witness who left the company to enter into direct competition *and* who received a significant sum from his Plan payout.

Plaintiffs herein were all long time employees of the company. Criscenti, Eccher and Ellis each worked for the company for more than twenty years. Pryor was with the company for more than twelve years. All of the plaintiffs rose from the field to management positions of substantial responsibility as the company grew and expanded through the seventies and eighties. Criscenti served as president of several company subsidiaries; Eccher was general manager of the company; Ellis became a superintendent and Pryor, a senior estimator. By all accounts, the plaintiffs were trusted and valued employees, and very much an integral part of the company family.

In February, 1986, the plaintiffs resigned from their various positions with the company and announced their intention to open their own, competitive construction company, Commercial Enterprises, Inc. Commercial Enterprises competes directly with the company and its subsidiaries, bidding on many of the same jobs. According to the plaintiffs, Commercial Enterprises has, thus far, been a successful venture.

Prior to the plaintiffs' resignations, the company had never before seen four valued, senior employees, with substantial management skills and experience, quit to open a competitive venture. At the time of their termination, the plaintiffs' noncontributory retirement accounts contained a combined total of almost $380,000 in accrued profits, approximately seven percent of the Plan assets, and far, far more than any other competing employee had accrued.

The testimony is inconsistent as to when plaintiffs were first advised that their profit sharing interests would be paid to them in ten, equal, annual installments. Ron Brady, now president of the company, testified that he advised at least some of the plaintiffs, at the time of their resignations, that the ten year plan would be invoked in their cases. Plaintiffs claim that they were not so advised until they received written notification from the Plan administrator, Smith, almost two years after they quit.

In January, 1988, four months after this action was filed, Smith advised plaintiffs, in writing, that their profit sharing benefits would be paid out in ten, equal, annual installments, pursuant to past practice and policy. The policy relied upon is that stated by E.F. Brady: that the profit sharing funds cannot be used to finance a competing enterprise. Smith's position was that, where, as here, employees leave the company to go into competition with the company, they should not receive their profit sharing benefits in a lump sum, but under the ten payment plan. Smith's concern echoed that of the company: plaintiffs' new enterprise would deleteriously affect the profitability of the company, and thus, the company contribution to the profit sharing plan.

While discretion as to the method and timing of payment is reserved to Smith under the terms of the Plan, the company's noncompetition policy is not set forth in either the summary or the Plan documents themselves. The company did amend the Plan in 1986 to include specific provisions regarding competition from former employees, but that amendment did not become effective until April 1, 1986, two months after the plaintiffs quit; as such, the amendment, the so-called "1986 modifications," is not applicable to this action, nor do defendants so assert.

## II. PLAINTIFFS' CLAIMS

Plaintiffs allege: (1) that there is no "past policy" governing profit sharing payments to former employees who enter into

direct competition with the company, and if there is, they were unaware of it and were not given notice of it; (2) even if there were such a policy, Smith breached his fiduciary duties and the terms of ERISA because the policy is not included in the Plan documents or summary; (3) even if there were such a policy, the policy is contrary to law and, under Labor Code Section 1054(g) (29 U.S.C. § 1054(g)), Smith did not have discretion to apply it; (4) Smith's decision to pay plaintiffs under the ten payment plan was arbitrary, capricious and in bad faith; (5) Smith breached his fiduciary duty to manage the Plan in the best interests of all of the participants when he implemented the ten payment plan in their case; and (6) the modifications to the Plan are not applicable to plaintiffs. Plaintiffs also request statutory damages arising from the alleged delay in responding to their requests for payment and attorneys fees according to statute.

As a preliminary matter, the plaintiffs' sixth contention, regarding the 1986 modifications of the Plan, is moot because Smith did not rely upon those modifications in deciding upon the form and timing of plaintiffs' profit sharing benefits. As such, the modifications are not before the court and the court need not reach the question of their validity or applicability.

### A. Past Policy

Plaintiffs argue that they did not know about the company policy regarding payments to competing former employees, and indeed, that no such policy existed. Plaintiffs' position was repeatedly refuted by the evidence presented at trial, and indeed, by plaintiffs' own testimony. During the trial, the focus of plaintiffs' assertion changed from the nonexistence of the policy to the expiration of the policy, by virtue of nonuse.

From the evidence presented at trial, it is clear that the company did have an unwritten policy providing that separating employees who leave the company to enter into direct competition should be paid their profit sharing benefits in ten, equal, annual installments. That policy was in effect at the time of the plaintiffs' resignations in February, 1986. The primary evidence of this policy is the minutes of the Grand Committee meetings held in 1969, 1973 and 1974. Both the discussion contained in those minutes regarding the ten payment plan, and the resulting decisions to pay terminating employees on the ten payment plan basis, support defendants' assertion of this policy.

Three of the four plaintiffs attended at least one of the meetings in which the ten payment plan policy was discussed. In fact, one of the plaintiffs, Criscenti, a regular member of the Grand Committee, made a motion to pay at least one departing employee his profit sharing benefits on the ten payment plan basis; that motion carried. Thus, plaintiffs knew about the ten payment plan policy at the time of their resignations, and cannot, in good faith, claim otherwise.

Plaintiffs produced a number of witnesses who testified that they left the company to go into competition, and were paid their profit sharing monies on a lump sum basis; these testifying employees claimed that they had not heard of the company policy. The court finds these witnesses unpersuasive.

First, none of them received more than $3,000 in his lump sum payout, hardly seed money for a competitive venture. Second, plaintiff Eccher, the Grand Committee profit sharing liason with the field employees, testified that he never told any of the field employees about the policy, because he did not believe it to be the policy. Thus, it is not surprising that the employees produced by plaintiffs claimed ignorance of the policy. Unlike the field employees, however, plaintiffs *did* know about the policy and, as such, cannot rely on the ignorance of their subordinates as proof that there is no policy.

In their own testimony, plaintiffs admitted to attending the Grand Committee meetings in which the ten payment plan and noncompetition policy were discussed. Basically, they admitted knowledge of the policy, but asserted that, because of the inaction of the policy since 1974, and the

fact that every terminating employee since 1974 had been paid on a lump sum basis, the plaintiffs *assumed* that the policy was not in effect.

█ Despite plaintiffs' protestation of extinction arising from nonuse, the court finds that the company did and does have a noncompetition policy as set forth above. The mere fact that the policy has not been invoked in the recent past does not dictate its abolition. Plaintiffs offered no affirmative evidence that the policy was knowingly abandoned by Smith or the company. In concluding that the policy was no longer effective because it had not seen recent use, plaintiffs overlooked the most obvious of explanations: the policy has not been invoked since 1974 because, until plaintiffs decided to resign, its use had not been warranted.

### B. Unwritten Policy as Breach of Fiduciary Duty and ERISA

█ Plaintiffs also claim that the policy cannot be applied to them because it is an unwritten policy, comprised of unspecific criteria. The substance of this assertion is that the policy itself, and the objective factors relied upon by the administrator in applying it, are not included in the Plan documents. Plaintiffs make the companion assertion that defendants violated the terms of ERISA by failing to provide a full explanation of the conditions of the Plan. (29 U.S.C. § 1021(a)). Notably, while making this assertion, plaintiffs did not allege a claim for breach of fiduciary duty under ERISA in their complaint.

The Second Circuit addressed precisely this lack of specificity under almost identical factual circumstances in *Morse v. Stanley*, 732 F.2d 1139 (2d Cir.1984), a case which this court follows. In *Morse*, the plaintiffs were all longterm and valuable employees of a publishing company who left to join a directly competing venture. Each had accumulated substantial profit sharing accounts. After separation, the plan trustees denied each plaintiff/former employee's request for a lump sum payout, relying on a policy not to grant accelerated distributions to employees who leave to

work for competitors, where the amount of the vested benefits exceeded $10,000. In challenging the trustees' decision, the plaintiffs claimed that the trustees should be estopped from applying the policy denying accelerated payment to them because the policy was not included in any of the plan documents. The appeals court upheld the trustees' action, finding that the denial of accelerated payments was within the trustees' discretion and the ERISA requirements were met where, as here, plaintiffs are not being *denied* benefits; their request as to the *form* in which the benefits are paid is being denied.

*Morse* is directly on point. As set forth below, discretion as to the timing and method of benefit payment is vested solely in the Plan administrator, Smith.

Article VI, Section 6.05(b) of the Plan provides that "[T]he Administrator shall determine in its sole discretion when payment of Benefits shall be made, but subject to the following provisions: ...," which provisions contain the ultimate cap that payment must commence not later than 60 days after the close of the Plan Year following the later of an employee's Termination of Employment or attainment of Normal Retirement Date. Thus, in the instant case, payment of the profit sharing benefits could be delayed until the plaintiffs attain normal retirement age, presumably 65, in the *bona fide* exercise of the Administrator's discretion.

Similarly, with respect to the method of payment, Article VI, Section 6.05(d) provides:

(d) *Method of Payment:* The Administrator in its sole discretion may direct the Trustee to distribute Benefits ... in any of the following methods:

(i) In a single sum.

(ii) In periodic payments of substantially equal amounts ... for a specified number of years, but not to exceed the Participant's or Inactive Participant's actuarially determined life expectancy at the date payments are to commence. Such periodic payments shall be made not less frequently than annually....

Thus, while plaintiffs may claim to be unaware of the company policy underpinning Smith's decision, they cannot claim that they did not know the nature and extent of the discretion vested in Smith, as clearly set forth in the Plan documents.

The *Morse* court relied upon the decision in *Pompano v. Michael Schiavone & Sons, Inc.*, 680 F.2d 911, 914 (2d Cir.1982), *cert. denied*, 459 U.S. 1039, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982), in support of its conclusion that the legislative history of the ERISA disclosure provisions indicates that those provisions are directed at disclosing circumstances where a beneficiary or participant will *not* receive his benefits. Where, as here, the administrator is not denying benefits, but exercising his clear discretion to determine when and how the benefits are paid, an equal degree of specificity and disclosure is not required. The *Pompano* court held that requiring such specificity would "undercut the flexibility essential to effective and responsible financial management of the plan which Congress intended when it adopted for ERISA fiduciaries the 'prudent man' standard." 680 F.2d at 914.

As in both *Pompano* and *Morse*, plaintiffs herein are not being denied benefits as, under the terms of the Plan, such payment *must*, in all events, commence within 60 days of the end of the Plan year following each participant's normal retirement date. Under all other circumstances, payment is made in the administrator's sole discretion. The court will not require the administrator to list all of the factors which he considers in exercising his discretion as such a requirement "would read out of the Plan the discretionary powers expressly granted to the Trustees to act as varying circumstances arise." *Morse*, 732 F.2d at 1147.

In light of the clear language of the Plan vesting in the administrator discretion as to both the timing and method by which the participants are to receive their profit sharing benefits, and the fact that plaintiffs herein are not being denied benefits, the court holds that Smith did not breach his fiduciary duty or the provisions of ERISA

as to disclosure, and the company's non-competition policy may be applied to plaintiffs even though it is not specifically spelled out in the Plan documents.

### C. Administrator's Discretion under Labor Code Section 1054(g)

Plaintiffs assert that Smith's discretion was limited by the passage of Retirement Equities Act (REA), in 1984, particularly, 29 U.S.C. § 1054(g)(2)(B), and its companion tax statute, 26 U.S.C. § 411(d)(6). Section 1054(g) provides in relevant part:

(1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, ...

(2) For purposes of paragraph (1), a plan amendment which has the effect of—

(A) eliminating or reducing an early retirement benefit or a retirement-type subsidy ... or

(B) eliminating an optional form of benefit, with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits....

Plaintiffs argue that this provision restricts, and indeed, eliminates Smith's discretion to choose among the payment options listed in the Plan, inasmuch as any such exercise of discretion would be an *amendment* eliminating an optional form of plaintiff's benefits. In *Oster v. Barco*, 859 F.2d 1345, (9th Cir.1988), the court rejected plaintiffs' position, ruling that the word "amendment" was intended as a limitation on the ambit of the statute and should be given its "commonsensical" meaning. 859 F.2d at 1350, citing *Dooley v. American Airlines*, 797 F.2d 1447 (7th Cir.1986), *cert. denied* 479 U.S. 1032, 107 S.Ct. 879, 93 L.Ed.2d 833, (1987), *cert. denied, American Airlines v. Dooley*, 479 U.S. 1087, 107 S.Ct. 1292, 94 L.Ed.2d 149 (1987). *Oster* involved an action by a beneficiary of a defined benefit plan whose request for a lump sum payout was denied by the plan trustees in the exercise of their discretion and via the retroactive application of a new policy under which terminating employees entitled to $3,500, or more, would not, as a general rule, be paid in a

lump sum. Notably, in *Oster*, virtually every past request for a lump sum payout had been granted, and the new policy was adopted two months after the plaintiff's resignation.

In *Oster*, the trustees adopted a policy which applied to a provision already a part of the pension plan. As here, the adoption of that policy did not result in the reduction of the plaintiff's benefits, just a delay in their payment. In the instant case, the administrator is applying a pre-existing policy to a provision already a part of the plan, the administrator's discretion to choose the payment method. As in *Oster*, the court holds that the application of this policy does not effect an amendment under the terms of Section 1054(g). Sections 1054(g) and 411(d)(6) do not apply to Smith's actions and the further question of the effective dates of those statutes, as applicable to the Plan, need not be reached.

### D. Smith's Actions Were not Arbitrary, Capricious, or in Bad Faith

■ Plaintiffs' contend that Smith's decision to implement the ten payment plan was arbitrary, capricious, and made in bad faith. Plaintiffs base this assertion on three grounds: (1) there was no policy regarding payments to competing employees; (2) virtually every other participant who has left the company in the past 20 years has received a lump sum payout; (3) the company and Smith colluded to punish the plaintiffs for leaving and forming their own company.

The first issue raised, the nonexistence of the policy, is exhaustively discussed above. Again, the court concludes both that there was such a policy in effect and that plaintiffs knew of the policy. Thus, plaintiffs' contention that the policy was not reported or disclosed to them is wholly without merit.

Plaintiffs' contention that the ten payment plan policy cannot be applied to them because *virtually* every other separating employee has received a lump sum payout is unpersuasive. In *Morse v. Stanley*, 732 F.2d at 1144, the court rejected precisely that line of reasoning, holding that, in a case where trustees had routinely granted requests for lump-sum distributions, "whether the Trustees had in the past granted acceleration to employees who requested it does not mean that they had donned a discretionary straightjacket which held them bound to grant acceleration in all cases as a matter of course." The *Morse* ruling was cited with approval in the recent Ninth Circuit decision in *Oster v. Barco, supra*, where the court held that "in spite of their prior conduct, the trustees did not act in an arbitrary or capricious manner in denying the employees requests [for accelerated benefits] where, as here, 'the Plan gave them broad discretion to evaluate requests for accelerated distribution on a case by case basis.'" *Oster*, at 1349, citing to *Morse*.

In *Morse*, only four of the some 79 employees who had left their employment in the previous seven years had been denied lump sum payment. The court rejected plaintiff's argument that "the Trustees had by their prior conduct established a practice of making distributions to all terminated Plan participants without regard either to the amount of the participant's account balance or the nature of his subsequent employment ... the Trustees should not now be permitted to reverse such practice and single them out for dissimilar treatment." *Morse*, 732 F.2d at 1144. Instead, the court upheld the implementation of a non-acceleration policy, holding that the Trustees' actions were consistent with their intended goal of encouraging employees to remain with their employer, rather than to offer a cash incentive to those who find employment with a competitor.

In *Oster*, as plaintiffs allege is the case here, virtually every past terminating participant was paid his accrued benefits in a lump sum. For the security of the plan as a whole, the trustees implemented a policy denying lump sum payment to terminating employees entitled to more than an established sum. The court upheld that exercise of discretion, ruling that "the Committee's prior record of routinely granting requests for lump-sum distributions is insufficient to establish that the Committee acted arbi-

trarily or capriciously in denying [plaintiff's] request." *Oster*, 859 F.2d at 1349.

In the instant case, plaintiffs' reliance on the previous lump sum payment history under the Plan is not well founded. As a factual matter, a review of the company's payout records indicates that the overwhelming majority of the payouts made to *all* employees were in sums of less than $5,000. Clearly, $5,000 would not provide adequate capital to fund a company capable of directly competing with the comparatively large E.F. Brady Co. Thus, in the overwhelming majority of the cases, the ten payment plan and noncompetition policy would not even arise. Plaintiffs offered no evidence that any of the employees entitled to substantial payouts from the Plan left the company to enter into direct competition. The court concludes that the policy has not been applied, and the ten payment plan has not been implemented in the recent past, because no *bona fide* occasion for invoking these noncompetition provisions arose.

It is uncontroverted that, under the terms of the Plan as written, discretion as to the mode of payment of benefits is vested in the administrator, Smith. Plaintiffs assert that Smith did not act alone in determining the mode of payment, and that he was unduly influenced by company management, including Ron Brady and the company's house counsel. These arguments are unconvincing. While management personnel may have provided Smith with input as to the policy of the company regarding competing former employees, Smith testified that he made the decision as to how the benefits would be paid, after considering the options and the ramifications of each option. Considering the interests of all of the plan participants, Smith's decision was sound and should not be disturbed. In a Plan such as this, where the benefits to the employees are wholly dependent upon the company's profitability, the interests of the company and the Plan participants will often coincide. This coincidence, alone, is insufficient to render Smith's exercise of discretion arbitrary, capricious or in bad faith.

*E. Smith did not Violate his Fiduciary Duty to Administer the Plan in the Interests of all of the Plan Participants*

Plaintiffs contend that Smith's action in deciding to invoke the ten payment policy was violative of Smith's fiduciary duties under ERISA. 29 U.S.C. § 1104(a)(1)(A)(i) (1982). Plaintiffs contend that: (1) the administrator is charged with administering the plan in the best interests of all of the plan participants and beneficiaries (29 U.S.C. § 1104(a)(1)(B)); (2) Smith has a close relationship with the company and there is some measure of professional emnity between the company and the plaintiffs' new company; and (3) a benefit is bestowed upon the defendant by Smith's decision.

The court finds that Smith did not abuse his discretion nor violate his fiduciary duties when he opted for the ten payment plan in plaintiffs' cases. Here, as in *Morse*, the Plan is funded entirely by employer contributions; thus, contributions to the Plan depend wholly upon the company's profitability. With the departure of the plaintiffs, defendant must deal not only with the costs engendered in replacing these key employees, but with the far more substantial competition costs arising from the plaintiffs' taking business away from the company.

Turning to the facts of the this action, if there ever was a group of employees to whom the policy should be applied, these plaintiffs are that group. In the first instance, plaintiffs are possessed of substantial business and management skills, and likely numerous connections in the construction industry which will prove invaluable in their enterprise. They were among the company's top managers. Added to that experience is their substantial profit sharing accounts, totalling almost $380,000. The combination of experience, skill and capital would render the plaintiffs a potent competitor to all but the very largest of construction companies. In evaluating the potential impact of the plaintiffs' competitive enterprise, Smith would have been remiss in his duties as Plan administrator if

he had not concluded that competition by plaintiffs in the San Diego and Southern California area would undoubtedly adversely affect the growth of the Plan via company contributions.

In evaluating the impact of Smith's decision on the individual plaintiffs, it is important to note that the plaintiffs left the company voluntarily, seeking better opportunity. Further, their better opportunity will inevitably be at the expense of the company, and thus, at the expense of the remaining majority of Plan participants. If the plaintiffs elect to receive their benefits at retirement, they will suffer no tax loss and will receive the money as part of their retirement funds, as intended. In a case of first impression in this circuit, this court finds that the administrator of a profit sharing plan need not consider the tax ramifications to individual participants when choosing between otherwise actuarily equivalent payment options. The net result of the ten payment plan is that plaintiffs will receive all of their benefits, although not as quickly as they would have preferred. There may or may not be some tax loss; that loss is at the plaintiffs' option. The plaintiffs will be denied their profit sharing funds for purposes of competing with their former employer, and more importantly, their former fellow employees.

Thus, the application of the ten payment plan policy in this instance was well taken and the result of sound business considerations. As in *Morse*, Smith's decision cannot be viewed as a breach of his duty to administer this plan in the sole interest of *all* of its participants.

Plaintiffs' assertion that Smith did not act impartially is not well grounded. While Smith does have a close relationship with the company and its executives, and the company obviously has an interest in seeing that its profit sharing funds are not used to a competitor's advantage, reasonable minds would agree that, in considering the interests of all the Plan participants, as outlined above, Smith's decision is sound. The fact that Smith was and is an "insider" at the company does not alter the sound-

ness of his decision. Smith should not be compelled to make decisions injurious to the Plan just because a better decision benefits the company. As the *Morse* court held, "[I]t is no violation of a trustee's fiduciary duties to take a course of action which reasonably best promotes the interest of plan participants simply because it incidentally also benefits the corporation." 732 F.2d at 1146. The fact that the administrator's decision, intended for the benefit of all of the participants of the Plan incidentally benefits the company, will not render that exercise of discretion by the administrator invalid.

## ATTORNEY'S FEES

■ Plaintiffs seek their attorneys fees irrespective of the resolution of the underlying case. 29 U.S.C. § 1132(g)(1), ERISA § 502(g)(1). The court declines to award such fees.

The factors considered in determining a litigant's entitlement to attorneys fees under ERISA are as follows: "(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing party to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions." *Hummell v. S.E. Rykoff & Co.*, 634 F.2d 446, 453 (9th Cir.1980).

In applying these factors to this case, the balance necessarily lies in the defendants' favor. Under factor (1), the court determines that the defendants did not act in bad faith. While defendants appear to be able to satisfy an award of attorneys fees under factor (2), analysis of the other factors precludes consideration of this factor. As to factor (3), there is no need to deter others from acting as defendants did in this instance. Under factor (4), the plaintiffs herein brought this action to benefit themselves, and by that benefit, likely would have injured the remaining members of the Plan. Factor (5) lands in the middle;

both parties had reason to form a good faith belief in their respective positions. Since, however, the weight of the factors favors the defendants, the court denies plaintiffs' claim for attorneys fees.

The defendants are instructed to pay to the plaintiffs their profit sharing benefits in ten, equal, annual payments, commencing immediately, or in such other manner or at such other time as the parties' may agree. Defendants shall be awarded their costs of suit, according to statute.